# MARYLAND AND VIRGINIA MILK PRODUCERS ASSOCIATION, INC., *v.* UNITED STATES.

No. 62.   Argued January 19–20, 1960.—Decided May 2, 1960.*

---

*Together with No. 73, *United States* v. *Maryland and Virginia Milk Producers Association, Inc.*, also on appeal from the same Court.

*Herbert A. Bergson* and *William J. Hughes, Jr.* argued the cause for the Maryland and Virginia Milk Producers Association, Inc.   With them on the brief were *Daniel J. Freed, Howard Adler, Jr.* and *Daniel H. Margolis.*

*Philip Elman* argued the cause for the United States. On the brief were *Solicitor General Rankin, Acting Assistant Attorney General Bicks, Charles H. Weston, Irwin A. Seibel* and *Joseph J. Saunders.*

Mr. Justice Black delivered the opinion of the Court.

This is a civil antitrust action brought by the United States in a Federal District Court against an agricultural cooperative, the Maryland and Virginia Milk Producers Association, Inc. The Association supplies about 86% of the milk purchased by all milk dealers in the Washington, D. C., metropolitan area, and has as members about 2,000 Maryland and Virginia dairy farmers. The complaint charged that the Association had: (1) attempted to monopolize and had monopolized interstate trade and commerce in fluid milk in Maryland, Virginia and the District of Columbia in violation of § 2 of the Sherman Act; [1] (2) through contracts and agreements combined and conspired with Embassy Dairy and others to eliminate and foreclose competition in the same milk market area in violation of § 3 of that Act; [2] and (3) bought all the assets of Embassy Dairy, the largest milk dealer in the area which competed with the Association's dealers, the effect of which acquisition might be substantially to lessen competition or to tend to create

---

[1] Sherman Act § 2: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." 26 Stat. 209 (1890), as amended, 15 U. S. C. § 2.

[2] Sherman Act § 3: "Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any Territory of the United States or of the District of Columbia . . . or between the District of Columbia and any State or States or foreign nations, is declared illegal. . . ." 26 Stat. 209 (1890), as amended, 15 U. S. C. § 3. Section 1 declares the same prohibition as to commerce "among the several States." Although there was also a charge against the Association under § 1 there was no judgment against it on this section, and that charge is no longer relevant here.

a monopoly in violation of § 7 of the Clayton Act.[3] The chief defense set up by the Association was that, because of its being a cooperative composed exclusively of dairy farmers, § 6 of the Clayton Act[4] and §§ 1 and 2 of the Capper-Volstead Act[5] completely exempted and immunized it from the antitrust laws with respect to the charges made in the Government's complaint. The District Court concluded after arguments that

> "an agricultural cooperative is entirely exempt from the provisions of the antitrust laws, both as to its very existence as well as to all of its activities, provided it does not enter into conspiracies or combinations with persons who are not producers of agricultural commodities." 167 F. Supp. 45, 52.

---

[3] Clayton Act § 7: "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

. . . . .

"Nothing contained in this section shall apply to transactions duly consummated pursuant to authority given by the . . . [independent regulatory commissions] or the Secretary of Agriculture under any statutory provision vesting such power in such Commission, Secretary, or Board." 38 Stat. 731 (1914), as amended, 15 U. S. C. § 18.

[4] 38 Stat. 731 (1914), 15 U. S. C. § 17, set forth in note 11, *infra*.

[5] Capper-Volstead Act § 1: "Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes . . . ." 42 Stat. 388 (1922), 7 U. S. C. § 291. Section 2 is set forth in note 7, *infra*.

Accordingly the court dismissed the Sherman Act § 2 monopolization charge, where the Association was not alleged to have acted in combination with others, but upheld the right of the Government to go to trial on the Sherman Act § 3 and Clayton Act § 7 charges because they involved alleged activities with the owners of Embassy and other persons who were not agricultural producers. After trial the court found for the United States on the latter two charges and entered a decree ordering the Association to divest itself within a reasonable time of all assets acquired from Embassy and to cancel all contracts ancillary to the acquisition. 167 F. Supp. 799, 168 F. Supp. 880. The court refused to grant additional relief the United States asked for. It is from this refusal and the dismissal of its Sherman Act § 2 monopolization charge that the Government appealed directly to this Court under the Expediting Act.[6] The Association similarly appealed to review the judgments against it on the Sherman Act § 3 charge and the Clayton Act § 7 charge. We noted probable jurisdiction, 360 U. S. 927, and treat both appeals in this opinion.

The Association's chief argument for antitrust exemption is based on § 2 of the Capper-Volstead Act, which authorizes the Secretary of Agriculture to issue a cease-and-desist order upon a finding that a cooperative has monopolized or restrained trade to such an extent that the price of an agricultural commodity has been "unduly enhanced."[7] The contention is that this provision was

---

[6] 32 Stat. 823 (1903), as amended, 15 U. S. C. § 29.

[7] Capper-Volstead Act § 2: "If the Secretary of Agriculture shall have reason to believe that any such association monopolizes or restrains trade in interstate or foreign commerce to such an extent that the price of any agricultural product is unduly enhanced by reason thereof [after a "show cause" hearing he may direct] such association to cease and desist from monopolization or restraint of

intended to give the Secretary of Agriculture primary jurisdiction, and thereby exclude any prosecutions at all under the Sherman Act. This Court unequivocally rejected the same contention in *United States* v. *Borden Co.*, 308 U. S. 188, 206, after full consideration of the same legislative history that we are now asked to review again. We adhere to the reasoning and holding of the *Borden* opinion on this point.

The Association also argues that without regard to § 2 of the Capper-Volstead Act, § 1 of that Act and § 6 of the Clayton Act demonstrate a purpose wholly to exempt agricultural associations from the antitrust laws. In the *Borden* case this Court held that neither § 6 of the Clayton Act nor the Capper-Volstead Act granted immunity from prosecution for the combination of a cooperative and others to restrain trade there charged as a violation of § 1 of the Sherman Act. Although the Court was not confronted with charges under § 2 of the Sherman Act in that case we do not believe that Congress intended to immunize cooperatives engaged in competition-stifling practices from prosecution under the antimonopolization provisions of § 2 of the Sherman Act, while making them responsible for such practices as violations of the anti-trade-restraint provisions of §§ 1 and 3 of that Act. These sections closely overlap, and the same kind of predatory practices may show violations of all.[8] The reasons underlying the Court's holding in the *Borden* case that the cooperative there was not completely exempt under § 1 apply equally well to §§ 2 and 3. The Clayton

trade. . . ." This order may be enforced by the Attorney General if not obeyed by the association. 42 Stat. 388 (1922), 7 U. S. C. § 292.

[8] *Klor's, Inc.*, v. *Broadway-Hale Stores, Inc.*, 359 U. S. 207, 211; *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 226, n. 59; *Standard Oil Co. of New Jersey* v. *United States*, 221 U. S. 1, 59–60.

and Capper-Volstead Acts, construed in the light of their background, do not lend themselves to such an incongruous immunity-distinction between the sections as that urged here.

In the early 1900's, when agricultural cooperatives were growing in effectiveness, there was widespread concern because the mere organization of farmers for mutual help was often considered to be a violation of the antitrust laws. Some state courts had sustained antitrust charges against agricultural cooperatives,[9] and as a result eventually all the States passed Acts authorizing their existence.[10] It was to bar such prosecutions by the Federal Government as to interstate transactions that Congress in 1914 inserted § 6 in the Clayton Act exempting agricultural organizations, along with labor unions, from the antitrust laws. This Court has held that the provisions of that section, set out below,[11] relating to labor

---

[9] See, e. g., Reeves v. Decorah Farmers' Cooperative Society, 160 Iowa 194, 140 N. W. 844 (1913); Burns v. Wray Farmers' Grain Co., 65 Colo. 425, 176 P. 487 (1918); Ford v. Chicago Milk Shippers' Assn., 155 Ill. 166, 39 N. E. 651 (1895). Contra, Burley Tobacco Society v. Gillaspy, 51 Ind. App. 583, 100 N. E. 89 (1912). Hanna, Antitrust Immunities of Cooperative Associations, 13 Law and Contemp. Prob. 488–490 (1948); Hanna, Cooperative Associations and the Public, 29 Mich. L. Rev. 148, 163–165 (1930); Jensen, The Bill of Rights of U. S. Cooperative Agriculture, 20 Rocky Mt. L. Rev. 181, 184–189 (1948). See generally Att'y Gen. Nat'l Comm. Antitrust Rep. (1955), 306–313; Note, 57 Mich. L. Rev. 921 (1959).

[10] See statutes collected in Jensen, The Bill of Rights of U. S. Cooperative Agriculture, 20 Rocky Mt. L. Rev. 181, 191, n. 29 (1948); Note, 38 Harv. L. Rev. 87, 89, n. 17 (1924). See Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 556–558 (1902), holding Illinois exemption statute unconstitutional, and see dissent per McKenna, J., at 565, 571; overruled by Tigner v. Texas, 310 U. S. 141 (1940).

[11] Clayton Act § 6: "The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the

unions do not manifest "a congressional purpose wholly to exempt" them from the antitrust laws,[12] and neither the language nor the legislative history of the section indicates a congressional purpose to grant any broader immunity to agricultural cooperatives. The language shows no more than a purpose to allow farmers to act together in cooperative associations without the associations as such being "held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws," as they otherwise might have been. This interpretation is supported by the House and Senate Committee Reports on the bill.[13] Thus, the full effect of § 6 is that a group of farmers acting together as a single entity in an association cannot be restrained "from lawfully carrying out *the legitimate objects* thereof" (emphasis supplied), but the section cannot support the contention that it gives such an entity full freedom to

___

purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws." 38 Stat. 730 (1914), 15 U. S. C. § 17.

[12] *Allen Bradley Co.* v. *Local Union No. 3,* 325 U. S. 797, 805; *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, 468–469. Cf. *United States* v. *Hutcheson,* 312 U. S. 219.

[13] "In the light of previous decisions of the courts and in view of a possible interpretation of the law which would empower the courts to order the dissolution of such organizations and associations, your committee feels that all doubt should be removed as to the *legality of the existence and operations* of these organizations and associations, and that the law should not be construed in such a way as to authorize their *dissolution* by the courts under the antitrust laws or to forbid the individual members of such associations from carrying out the *legitimate and lawful objects* of their associations." (Emphasis supplied.) H. R. Rep. No. 627, 63d Cong., 2d Sess. 16; S. Rep. No. 698, 63d Cong., 2d Sess. 12.

engage in predatory trade practices at will. See *United States* v. *King*, 229 F. 275, 250 F. 908, 910. Cf. *United States* v. *Borden Co.*, 308 U. S. 188, 203–205.

The Capper-Volstead Act of 1922 extended § 6 of the Clayton Act exemption to capital stock agricultural cooperatives which had not previously been covered by that section.[14] Section 1 of the Capper-Volstead Act also provided that among "the legitimate objects" of farmer organizations were "collectively processing, preparing for market, handling, and marketing" products through common marketing agencies and the making of "necessary contracts and agreements to effect such purposes." We believe it is reasonably clear from the very language of the Capper-Volstead Act, as it was in § 6 of the Clayton Act, that the general philosophy of both was simply that individual farmers should be given, through agricultural cooperatives acting as entities, the same unified competitive advantage—and responsibility—available to businessmen acting through corporations as entities. As the House Report on the Capper-Volstead Act said:

> "Instead of granting a class privilege, it aims to equalize existing privileges by changing the law applicable to the ordinary business corporations so the farmers can take advantage of it." [15]

This indicates a purpose to make it possible for farmer-producers to organize together, set association policy, fix prices at which their cooperative will sell their produce, and otherwise carry on like a business corporation without thereby violating the antitrust laws. It does not suggest

---

[14] Some Congressmen opposed § 6 of the Clayton Act because it did not include agricultural associations with capital stock. "Under the provisions of section 7 [now § 6] of this bill farmers' organizations with capital stock, organized for profit, would be left subject to the provisions of the Sherman antitrust law." H. R. Rep. No. 627, Pt. 4, 63d Cong., 2d Sess. 4. And see *id.*, Pt. 3, 10.

[15] H. R. Rep. No. 24, 67th Cong., 1st Sess. 2.

a congressional desire to vest cooperatives with unrestricted power to restrain trade or to achieve monopoly by preying on independent producers, processors or dealers intent on carrying on their own businesses in their own legitimate way. In the Senate hearings on the Capper-Volstead Act the Secretary of Agriculture, who was given a large measure of authority under this Act, and the Solicitor of his Department, testified that the Act would not authorize cooperatives to engage in predatory practices in violation of the Sherman Act.[16] And the House Committee Report assured the Congress that:

> "In the event that associations authorized by this bill shall do anything forbidden by the Sherman Antitrust Act, they will be subject to the penalties imposed by that law." [17]

Although contrary inferences could be drawn from some parts of the legislative history, we are satisfied that the part of the House Committee Report just quoted correctly interpreted the Capper-Volstead Act, and that the Act did not leave cooperatives free to engage in practices against other persons in order to monopolize trade, or restrain and suppress competition with the cooperative.

---

[16] The Solicitor of the Department of Agriculture testified that it was his "opinion that if the farmers want to create monopolies or want to engage in unfair practices in commerce, this bill certainly would not give them the right to do it, and they would have to get another bill. . . . [T]hese organizations would not be allowed to adopt any illegal means or methods of conducting their business," and if they "engaged in some practice that prevented other people from selling their milk . . . they would be subject to the antitrust laws. . . . It does not say . . . that they may adopt any unfair methods of competition." The Secretary of Agriculture testified to the same effect. Hearings before a Subcommittee of the Senate Judiciary Committee on H. R. 2373, 67th Cong., 1st Sess. 203, 204, 205.

[17] Op. cit., supra, note 15, at 3.

Therefore, we turn now to a consideration of the District Court's judgments in this case.

*Sherman Act § 2 Dismissal.*—The complaint charging monopolization alleged that the Association had "[t]hreatened and undertaken diverse actions to induce or compel dealers to purchase milk from the defendant [Association], and induced and assisted others to acquire dealer outlets" which were not purchasing milk from the Association. It also alleged that the Association "[e]xcluded, eliminated, and attempted to eliminate others, including producers and producers' agricultural cooperative associations not affiliated with defendant, from supplying milk to dealers." Supporting this charge the statement of particulars listed a number of instances in which the Association attempted to interfere with truck shipments of nonmembers' milk, and an attempt during 1939–1942 to induce a Washington dairy to switch its non-Association producers to the Baltimore market. The statement of particulars also included charges that the Association engaged in a boycott of a feed and farm supply store to compel its owner, who also owned an Alexandria dairy, to purchase milk from the Association, and that it compelled a dairy to buy its milk by using the leverage of that dairy's indebtedness to the Association. We are satisfied that the allegations of the complaint and the statement of particulars, only a part of which we have set out, charge anticompetitive activities which are so far outside the "legitimate objects" of a cooperative that, if proved, they would constitute clear violations of § 2 of the Sherman Act by this Association, a fact, indeed, which the Association does not really dispute if it is subject to liability under this section. It was error for the District Court to dismiss the § 2 charge.

*Clayton Act § 7 Judgment.*—In 1954 the Association purchased the assets of Embassy Dairy in Washington. The complaint charged that this acquisition constituted

a violation of § 7 of the Clayton Act, which prohibits a corporation engaged in commerce from acquiring all or any part of the assets of another corporation so engaged where the effect may be to tend to create a monopoly or substantially lessen competition. A trial was had before the District Court on this charge and the court found that the motive for and result of the Embassy acquisition was to: eliminate the largest purchaser of non-Association milk in the area; force former Embassy non-Association producers either to join the Association or to ship to Baltimore, thus both bringing more milk to the Association and diverting competing milk to another market; eliminate the Association's prime competitive dealer from government contract milk bidding; and increase the Association's control of the Washington market. On these findings, amply supported by evidence, the District Court could properly conclude, as it did, that the Embassy acquisition tended to create a monopoly or substantially lessen competition, and was therefore a violation of § 7.[18]

This leaves the contention that the acquisition of Embassy was protected by the last paragraph of § 7 of the Clayton Act which in pertinent part provides that:

> "Nothing contained in this section shall apply to transactions duly consummated pursuant to authority given by . . . the Secretary of Agriculture under any statutory provision vesting such power in such . . . Secretary . . . ."[19]

The Association contends that its purchase of Embassy Dairy was "consummated pursuant to authority given by . . . the Secretary of Agriculture." The trouble with this contention is that there is no "statutory provision" that vests power in the Secretary of Agriculture to approve a transaction and thereby exempt a cooperative

---

[18] 167 F. Supp. 799, 807–808.

[19] See note 3, *supra*.

from the antitrust laws under the circumstances of this case. While there is a "statutory provision" vesting power in the Secretary of Agriculture to enter into agricultural marketing agreements which "shall be deemed to be lawful" and "not . . . be in violation of any of the antitrust laws of the United States," no such marketing agreement is involved here.[20]

*Sherman Act § 3 Judgment.*—The complaint charged that the Association, Embassy and others had violated § 3 of the Sherman Act by engaging in a combination and conspiracy to eliminate and foreclose competition with the Association and with dealers purchasing milk from the Association. The District Court, with the consent of the parties, considered and decided this § 3 charge on the evidence offered on the § 7 Clayton Act charge. A crucial element in this charge of concerted action was the Association's purchase of Embassy's assets under a contract containing an agreement by the former owners of Embassy not to compete with the Association in the milk business in the Washington area for 10 years, and to attempt to have all former Embassy producers either join the Association or ship their milk to the Baltimore market. Also, particularly pertinent to the charge of a § 3 combination, was evidence showing a long and spirited business rivalry between the Association and its producers on the one hand and Embassy and its independent producers on the other. The Association had been "unhappy" about Embassy's price cutting and its generally "disruptive" competitive practices that had made Embassy a "thorn in the side of the Association for many years." There was also evidence emphasized by the court in its

[20] Agricultural Adjustment Act, § 8b, as amended, 7 U. S. C. § 608b. *United States* v. *Borden Co.,* 308 U. S. 188, 198–202; *United States* v. *Rock Royal Co-operative, Inc.,* 307 U. S. 533, 560; *United States* v. *Maryland & Virginia Milk Producers' Assn., Inc.,* 90 F. Supp. 681, 688.

Clayton Act § 7 opinion that "the price paid by the Association for the transfer was far in excess of the actual and intrinsic value of the property purchased." 167 F. Supp. 799, 806.. After readopting its Clayton Act § 7 findings regarding the anticompetitive motives and results of the Embassy acquisition, see p. 469, *supra,* the District Court made the three following additional findings on the Sherman Act § 3 charge: (1) "that the result of the transaction complained of was a foreclosure of competition," (2) "that the transaction complained of was entered into with the intent and purpose of restraining trade," [21] and (3) "that an unreasonable restraint of trade, violative of the Sherman Act, has resulted from the acquisition of Embassy Dairy by the defendant [Association]." On the basis of its findings and opinion the court then concluded that "the transaction involving the acquisition of Embassy Dairy by the defendant constitutes a violation of Section 3 of the Sherman Act." 168 F. Supp. 880, 881, 882.

The facts found by the court show a classic combination or conspiracy to restrain trade, unless, as the Association contends, "the transaction involving the acquisition of Embassy" upon which the judgment against it was based is protected against Sherman Act prosecutions by the Capper-Volstead Act's provisions that cooperatives can lawfully make "the necessary contracts and agreements" to process, handle and market milk for their producer-members. The Embassy assets the Association acquired are useful in processing and marketing milk, and we may assume, as it is contended, that their purchase simply for business use, without more, often would be permitted and would be lawful under the Capper-Volstead

---

[21] See *United States* v. *Griffith,* 334 U. S. 100, 105. Cf. *United States* v. *Columbia Steel Co.,* 334 U. S. 495, 525; *United States* v. *Paramount Pictures, Inc.,* 334 U. S. 131, 173.

Act. But even lawful contracts and business activities may help to make up a pattern of conduct unlawful under the Sherman Act.[22] The contract of purchase here, viewed in the context of all the evidence and findings, was not one made merely to advance the Association's own permissible processing and marketing business; it was entered into by both parties, according to the court's findings as we understand them, because of its usefulness as a weapon to restrain and suppress competitors and competition in the Washington metropolitan area. We hold that the privilege the Capper-Volstead Act grants producers to conduct their affairs collectively does not include a privilege to combine with competitors [23] so as to use a monopoly position as a lever further to suppress competition by and among independent producers and processors.

*Adequacy of Relief.*—The Government's appeal in this case is directed in part at the relief granted it by the District Court. The judgment requires the Association to "dispose of as a unit and as a going dairy business all [Embassy] assets . . . tangible or intangible, which it acquired on July 26, 1954, and replacements therefor," and to do so in "good faith" to preserve the business in "as good condition as possible." The District Court refused to go further and require the Association to dispose of "all assets used" in the Embassy operation, to prohibit the Association from operating as a dealer in the Washington market for a period after divestiture, to prevent the future acquisition of distributors without prior approval of the Government, and to grant the Government general "visitation rights" as to the Association's records and employees. The District Court was of the view that the Government would either be ade-

---

[22] See *Schine Chain Theatres, Inc.,* v. *United States,* 334 U. S. 110, 119.

[23] See *United States* v. *Maryland Cooperative Milk Producers, Inc.,* 145 F. Supp. 151.

quately protected as to these matters by the "good faith" requirement or by subsequent orders of the District Court when the occasion necessitated. The formulation of decrees is largely left to the discretion of the trial court, and we see no reason to reject the judgment of the District Court that the relief it granted will be effective in undoing the violation it found in view of the fact that it also retains the cause for future orders, including the right of visitation if deemed appropriate. See *Associated Press* v. *United States,* 326 U. S. 1, 22–23.

Accordingly, the judgment of the District Court finding violations of § 7 of the Clayton Act and § 3 of the Sherman Act is affirmed, and its dismissal of the charges under § 2 of the Sherman Act is reversed and remanded for a trial.

*Affirmed in part, reversed and remanded in part.*