ERIE SAND AND GRAVEL COMPANY,
a corporation, Petitioner

v.

FEDERAL TRADE COMMISSION,
Respondent.

No. 13106.

United States Court of Appeals
Third Circuit.

Argued Feb. 6, 1961.

Decided May 29, 1961.

John E. Britton, Erie, Pa. (A. Grant Walker, of Gifford, Graham, MacDonald & Illig, Erie, Pa., D. C. Daniel, of Daniel and Smith, Washington, D. C., on the brief), for petitioner.

Frederick H. Mayer, Washington, D. C. (Pgad B. Morehouse, Acting General Counsel, Alan B. Hobbes, Asst. Gen. Counsel, Washington, D. C., on the brief), for respondent.

Before BIGGS, Chief Judge, and STALEY and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

This petition requires that we review an order of the Federal Trade Commission directing Erie Sand and Gravel Co. to divest itself of the recently purchased assets of another corporation which had been its competitor.

Erie is engaged, directly and through wholly owned subsidiaries, in the business of dredging and selling lake sand

from the bottom of Lake Erie. Before 1955, Erie's principal competitor in the sale of lake sand was the Sandusky Division of the Kelly Island Co. In 1954 two investment banking firms bought control of Kelly. Soon thereafter they voted to liquidate the entire corporation. The assets of the Sandusky Division were publicly offered for sale as a unit. Erie submitted the highest bid and early in 1955 purchased all of the Sandusky assets at a total price of $1,074,309.13. This purchase included three ships, one fully equipped dock, leasehold interests in six other docks, inventories, unfilled orders and customer lists.

As a result of these acquisitions Erie's business increased greatly in 1955 and 1956, so that it became the dominant lake sand producer on Lake Erie.

Late in 1956 the Federal Trade Commission issued a complaint against Erie alleging that the above-described acquisition of the assets of a competitor violated Section 7 of the Clayton Act, as amended. The hearing examiner and the Commission itself·successively held against Erie and ordered it to divest itself of almost all of the acquired assets and to create a competitive entity substantially equivalent to the Sandusky Division as it had existed before the sale. Erie then filed the present petition asking that we review and set aside the order of the Commission.

## I

Section 7 of the Clayton Act, as amended, 64 Stat. 1125, 15 U.S.C.A. § 18, reads as follows:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

At the outset, Erie argues that its 1955 acquisition could not have violated Section 7 because the owner of the competing Sandusky Division had made a firm and unqualified decision to liquidate its business before Erie entered the picture as one of several bidders for the Sandusky assets. This fact, which is admitted, is said to show that Erie would have been relieved of the Sandusky competition whether or not it purchased the Sandusky business.

The evidence does not support this factual inference. Sandusky was a profitable enterprise and it was offered for sale as a going concern. Its ships and docks and internal organization were all in condition for the indefinite continuation of the business. In the years immediately preceding the decision to liquidate, the business earned substantial profits. No reason appears for believing that it would not have continued to prosper. It is not surprising, therefore, that although Erie was high bidder with an offer of about one million dollars, there were several other substantial offers of $800,000 or more for the going concern. Thus, had Erie not bid, the prospect was not the elimination of a competing enterprise but merely its continuation under some new proprietorship.

In support of its position on this point, appellant cites the so-called "failing company" doctrine of International Shoe Co. v. Federal Trade Commission, 1930, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431. But the fact that the proprietors of Sandusky had decided to liquidate is not enough to create a "failing company" situation. That doctrine, as its name suggests, makes Section 7 inapplicable to the acquisition of a competitor which is in such straits that the termination of the enterprise and the dispersal of its assets seems inevitable unless a rival proprietor shall acquire and continue the business. The International Shoe opinion itself describes the situation before the Court as that of "a corporation with resources so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure with re-

sulting loss to its stockholders and injury to the communities where its plants were operated * * * (there being no other prospective purchaser) * * *." 280 U.S. at page 302, 50 S.Ct. at page 93. It was in such circumstances that a merger was viewed as likely to be less harmful in its possible adverse effect on competition than obviously advantageous in saving creditors, owners and employees of the failing business from serious impending loss. See Bok, Section 7 of the Clayton Act and the Merging of Law and Economics, 74 Harv.L.Rev. 226, 340–42. The picture presented by the prosperous Sandusky Division here was the antithesis of such a "failing company" situation. Erie's first argument is, therefore, without merit.

## II

Section 7 of the Clayton Act prohibits those mergers which may substantially lessen competition "in any line of commerce in any section of the country". The application of the quoted language is the next controversial point in this case.

The Commission was here concerned with competition to supply sand suitable for use in high-grade ready-mix concrete. Accordingly, we shall use the phrase "concrete sand" to describe sand from any source which satisfactorily fills that need. It is also clear that in the vicinity of Lake Erie there are two principal sources of concrete sand. One is the lake bottom from which Erie and certain competitors dredge sand. The other is the banks of rivers flowing into Lake Erie and a scattered group of pits which were covered by the lake in pre-historic times but now are located inland at varying distances from the lake shore.

In its findings the Commission restricted the "line of commerce" considered and regulated to lake sand. However, the record is clear that pit or bank sand also is used satisfactorily and on a large scale for the making of concrete, including concrete which meets the high specifications of the federal government for building sand, although it may require preliminary washing not needed by lake sand. At more than twenty places in the record there is positive testimony that bank or pit sand has proved interchangeable with lake sand as a high-grade building material. It is particularly significant that the record shows that in the building of the Ohio and Pennsylvania Turnpikes and the New York Thruway both types of sand met government specifications and were used interchangeably. The Erie County, Pennsylvania, Thruway was built entirely with pit and bank sand in 1957 and 1958. On the basis of such evidence the brief of the government on this appeal concedes that in 1956 at least 1,800,000 tons of pit and bank sand meeting government specifications were sold, principally for concrete making, within twenty-five miles of the southern shore of Lake Erie. In these circumstances, the functional interchangeability of pit and bank sand with lake sand was overwhelmingly established.

 If the question of suitability for making high-grade concrete were the only relevant consideration, the present record would require the conclusion that the relevant market to be considered in judging the effect of the present merger on competition includes bank and pit sand as well as lake sand. Cf. United States v. E. I. duPont de Nemours & Co., 1956, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264. But the question whether two commodities are in the same line of commerce in a section of the country involves more than the problem of comparative utility for a particular purpose. For the area of effective competition may also be limited by differences in costs of production and transportation. Within a given area the sale price of one commodity may necessarily be so much higher than that of another which serves the same purpose that the more expensive product is not competitive there. Thus, the question of what can economically be sold—the "line of commerce" question—and the question where it can be sold—the "section of the country" question—will often be so related that the answer to each qualifies the answer to the other.

This seems to be such a case. The record shows that the cost of transporting sand, a heavy and bulky commodity, is such that sellers whose sources of supply are far from a concrete-making operation cannot compete with sellers whose sources are nearby. Thus, it is not economical to transport sand from remote inland pits for making concrete at points near the docks where lake sand is landed. Similarly, lake sand cannot compete with pit sand very far inland. The picture here is also complicated by the fact that the sand pits and banks south of Lake Erie are located at varying distances from the shore, some very close to it, others miles away.

In these circumstances the Commission undertook in its findings to define a relevant market area near the southern shore of Lake Erie within which cartage costs would prevent pit and bank sand from being competitive with lake sand. In so doing it adopted the examiner's findings that the "area along the southern shore of Lake Erie from Buffalo, New York, to Sandusky, Ohio, and extending up to twelve miles inland, with the greatest concentration of sales being effected within the first five miles from the shore is a 'section of the country' within the intent and meaning of Section 7 of the Clayton Act." The Commission concluded that the amount of pit and bank sand sold for concrete making within this "contiguous geographical area embracing the south shore area of Lake Erie" was so small as to be immaterial. It also concluded that "lake sand is a sufficiently distinct product" to constitute a separate "line of commerce".

In reaching these conclusions the Commission did not state even in approximation the amounts of sand of the different types sold within the twelve mile strip, although the 2000 pages of the record are filled with the testimony of many people on this important matter. However, on this appeal, the government itself offers a tabulation, based on its analysis of the record, showing sales of more than 1,100,000 tons of pit and bank sand in 1956, as compared with 1,563,000 tons of lake sand, within the twelve mile strip bordering the south lake shore. Actually, the figure 1,100,000 tons represents only the pit and bank sand sold within eight unconnected semicircles of the radius of twelve miles each, which the government has drawn around the docks of the principal port cities. This revision of the Commission's stated conception of the section of the country reduces the "section" by almost one-half and eliminates from consideration any pit and bank sand sold for concrete making within the Commission's twelve mile strip but more than twelve miles from any dock. For example, a sale of 50,000 tons of pit sand by Newbury Sand and Gravel, Inc. to a customer one mile from Lake Erie is now disregarded by the government because the point of delivery was fifteen miles from the Cleveland docks. Moreover, the government's computations on this appeal have minimized the sale of pit and bank sand by repeatedly rejecting as unpersuasive direct testimony, and even business records, of particular large sales of such sand within the twelve mile strip. As an appellate court we should not and will not undertake any such partisan discrediting of evidence.

The government has utilized still another expedient in its effort to reduce the amount of pit and bank sand sold in competition with lake sand. It has reduced the radius of the above-described semicircles surrounding two of the eight cities—Buffalo and Cleveland—from twelve miles to five miles and has thereby excluded another 1,000,000 tons of pit and bank sand. In so doing the government has rejected the Commission's basic conception of the relevant section of the country as a continuous strip extending twelve miles inland along the entire length of Lake Erie. Only through its drastic reduction and fragmentation of the relevant market area, combined with its rejection of a large amount of the evidence introduced before the Commission as to sales even within the reduced area, has the government escaped the conclusion that pit and bank sand actually commanded at least as large a share of

the market for concrete sand near Lake Erie as did lake sand.

As a reviewing court we cannot properly substitute the government's present view that the relevant market area is a series of separated small semicircles for the finding of the Commission below that the relevant section of the country is a much more inclusive contiguous area. Yet, if that larger section is used to define the relevant market, as it must be on the present record, then the Commission was clearly wrong in ignoring the large sales of pit and bank sand within that area in its determination of the effect of the merger in question on competition.

The Commission oversimplified the question of the effect of the merger on competition by treating lake sand as enjoying a practical monopoly in concrete making within the twelve mile strip. It considered only that Erie, the second largest producer of lake sand with sales representing 35% of this business while Sandusky remained a competitor, became overwhelmingly dominant among the producers of lake sand as a result of the merger, thereafter doing between 75% and 80% of the lake sand business. Under this analysis the extreme effect of the merger on competition was obvious. But if the sales of bank and pit sand for concrete making within the twelve mile strip had been taken into account, the effect of the merger upon competition would have been much less drastic. On the present record it could be found that even after the merger Erie's production and sale of sand represented substantially less than one-half of the total commerce in concrete sand within this area. Perhaps even then it would be concluded that the merger had such an actual or potential effect in lessening competition that it should be adjudged a violation of Section 7. But while that conclusion may well be permissible, it is far from obvious. Experts might possibly differ in their judgment of the matter. Therefore, it is appropriate that the Commission be given an opportunity to reconsider the case, correcting the basic factual errors it has made, first, in differentiating lake sand from pit and bank sand functionally and, second, in overlooking the large amount of pit and bank sand sold for concrete making within the twelve mile strip.

At the same time we think the Commission should be free to consider the government's present contention that the section of the country consists of several small unconnected areas, if it so desires. It may well be that the "section of the country" provision of Section 7 of the Clayton Act could be satisfied by the drawing of unconnected circles with varying radii defining a relevant market area. The "sections" recognized in the adjudicated cases under Section 7 have varied in size from a ten state region in American Crystal Sugar Co. v. Cuban-American Sugar Co., 2 Cir., 1958, 259 F.2d 524, to the metropolitan area in and around the city of Washington, D. C. in United States v. Maryland and Virginia Milk Producers Ass'n, D.C.D.C.1958, 167 F.Supp. 799, affirmed 1960, 362 U.S. 458, 468–470, 80 S.Ct. 847, 4 L.Ed.2d 880. In United States v. Brown Shoe Co., D.C. E.D.Mo.1959, 179 F.Supp. 721, probable jurisdiction noted 363 U.S. 825, 80 S.Ct. 1595, 4 L.Ed.2d 1521, each of a number of cities of 10,000 or more population, with its immediate and contiguous surrounding area, was treated as a section of the country.

If the evidence establishes to the satisfaction of the Commission that the economic realities of the production and marketing of high-grade sand limit sales by Erie and other lake sand producers to to the semicircular area around certain docking facilities at various points along the lake shore, rather than to a larger continuous twelve mile strip, we now see no conceptual obstacle to treating such a marketing area as a section of the country within the meaning of Section 7. There is, of course, the additional question whether it is reasonable to use particular radii, differing in length in different circumstances, to measure the several units of the alleged market area. The Commission has not exercised its judgment on these special refinements of

the conception of "section of the country" which the government urges are proper in the circumstances of this case. Until the Commission has done all of this, it seems appropriate that we confine our ruling on this matter to the observation that, in the light of the decisions cited above, the government's proposed definition of the revelant market area is not on its face inconsistent with anything in Section 7 of the Clayton Act.

Finally, if the Commission should take the government's view of the "section of the country" it should make explicit its considered evaluation of the numerous sworn statements in the record showing substantial sales of pit and bank sand even within that restricted area. It is not clear that lake sand enjoys a practical monopoly even there.

The order of divestiture will be vacated and the cause remanded for reconsideration in the light of this opinion.