**CASE-SWAYNE CO., INC., Plaintiff,**

v.

**SUNKIST GROWERS, INC., Defendant.**

**No. 333–58–DWW.**

United States District Court,
C. D. California.

May 6, 1971.

Kindel & Anderson, Los Angeles, Cal., by Roger J. Nichols and Richard A. Perkins, Beverly Hills, Cal., for plaintiff.

Beardsley, Hufstedler & Kemble, by Seth M. Hufstedler and John Sobieski, Jr., Los Angeles, Cal., and Dale V. Cunningham, Sherman Oaks, Cal., and Donald D. Stark, Corona, Cal., for defendant.

AMENDED DECLARATORY JUDGMENT ON ONE ISSUE

DAVID W. WILLIAMS, District Judge.

The suit before this Court is an antitrust action which has had a long history. In the original complaint, Case-Swayne, a processor of single strength and blended orange juices, sought treble damages from Sunkist under Section 4 of the Clayton Act (15 U.S.C. § 15) for alleged monopoly and an attempt to monopolize the fruit and product fruit markets in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2). Prior to trial, on the basis of facts stipulated by the parties, the trial court held that the Sunkist organization was ex-

empt from the antitrust laws under Section 1 of the Capper-Volstead Act as "persons engaged in the production of agricultural products . . ." (7 U.S. C. § 291). After hearing the plaintiff's evidence, the trial court also indicated that there was insufficient evidence of Sunkist's attempt to monopolize for the case to go to the jury.

Case-Swayne appealed to the Ninth Circuit [1] and that Court held that the lower court erred because there was evidence which might properly show a wrongful use of monopoly power. The majority affirmed the trial court, however, in its holding that Sunkist's organization came within the exemption of the Capper-Volstead Act. Judge Ely dissented from the latter ruling, arguing that the membership of non-producers in the Sunkist system deprived the organization of any Capper-Volstead exemption.

Both parties then petitioned the United States Supreme Court for writs of certiorari [2], Case-Swayne contending that the ruling that defendant was exempt under the Capper-Volstead Act was in error and Sunkist contending that the Ninth Circuit's conclusion that a possibility of monopolistic conduct existed was erroneous. The Supreme Court granted Case-Swayne's petition and subsequently held that Sunkist's corporate structure did not entitle it to Capper-Volstead exemption. Sunkist's petition for certiorari was denied.

In 1968, following the Supreme Court decision, Sunkist reorganized its corporate structure in an attempt to come within the Capper-Volstead exemption. In order to expedite resolution of this action, both parties have moved this Court to rule on whether Sunkist's reorganization presently brings it within the Capper-Volstead Act exemption. They have stipulated to the relevant facts for purposes of this ruling.

Agricultural production is a peculiarly precarious area of the national economy.

Because of production's dependency upon acts of God, a farmer cannot predict the amount of crop his land will yield in a given season. He may suffer economically from a very large yield as well as from a small one. Obviously, if the land yields a meager crop the farmer has little to sell and therefore earns very little. When there is a bumper crop, the large supply drives prices down, and the farmer's profit is again reduced. Farmers suffer similar adverse consequences when an optimum crop has been produced, if that supply is not wisely distributed but over-supplied to some markets and not supplied to others. Finally, since an individual farmer cannot produce enough of a crop to affect significantly the availability of that crop to the consumer markets, he has no ability to set a minimum price for his product. For the last century, farmers and other agricultural producers have attempted to counteract these disadvantages and achieve some economic stability through the development of cooperative associations. The history of the California citrus industry is typical.

With the advent of the railroad between California and the East coast, California citrus growers first began marketing their products over a widespread geographic area. Initially, growers made their shipments to the Eastern markets on an individual basis, but soon thereafter began joining with other growers to pool their fruit in cooperative organizations for purposes of sale.

Before picked fruit could be sold effectively, it had to be sorted, graded, washed, packed and shipped. With the expansion of the citrus industry into the larger Eastern markets, privately owned packing houses developed which provided these services to growers. At first both individual growers and cooperative associations contracted with private packing houses for their services. In the early 1890's, some of the cooperative associa-

1. Case-Swayne Co. v. Sunkist Growers, Inc., 369 F.2d 449 (9th Cir. 1966.)

2. Case-Swayne Co. v. Sunkist Growers, Inc., 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed. 2d 621 (1967).

tions enlarged their functions and began to acquire their own packing house facilities. Both cooperatively and privately owned facilities presently exist.

Initially, even the expanded cooperative associations did no more than pool fruit and process it through the shipping stage. The fruit was then sold on the East coast by independent "brokers" who worked on commission and who consequently had no interest in seeing that the fruit was evenly distributed in the Eastern markets. To remedy this situation, several of the cooperatives attempted further functional expansion and replaced the independent brokers with their own representatives who went to the East coast to market the fruit more efficiently, thereby maximizing the growers' profits. Nevertheless, for a variety of reasons, these early attempts at cooperative marketing failed.

In 1893, many of the growers adopted a plan for pooling fruit at the packing house level and marketing it cooperatively on a district-wide basis. Each producing district had an informal Board of Exchange composed of cooperatives and individual growers. The boards were responsible for uniform grading and branding as well as for selling the fruit. The various District Boards in turn selected representatives to a larger Executive Board which regulated and prorated sales from the several districts.

At approximately the same time the citrus growers and other farmers and ranchers were entering into cooperative organizations, Congress passed the Sherman Act of 1890 prohibiting combinations with anti-competitive effects or which attempted to monopolize an area of commerce. In interpreting this legislation, several courts subsequently held that the simple organization of farmers into cooperatives was violative of the Sherman Act's provisions.[3] This result, obviously detrimental to farmers, was apparently not within the intent of Congress. In order to clarify its position,[4] Congress specifically exempted from all antitrust laws "the existence and operation of . . . agricultural . . . organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit . . . (as well as) individual[s] . . . carrying out legitimate objects thereof." Clayton Act, § 6 (15 U.S.C. § 17).

Section 6 of the Clayton Act protected only cooperatives without capital stock. This limited protection proved insufficient to make agriculture a viable area of the economy. The condition of the farmers became especially depressed following the close of World War I. As noted by Senator Hitchcock on the United States Senate floor, farmers were faced with wide-spread ruin and bankruptcy.[5]

Justice McReynolds's majority opinion in Liberty Warehouse Co. v. Burley T. G. Co-op. M. Asso., 276 U.S. 71, 93, 48 S.Ct. 291, 295, 72 L.Ed. 473 (1927), recognized the plight of the farmers, stating "we take judicial knowledge of the history of the country and of current events and from that source we know

---

3. See, e. g., Reeves v. Decorah, Farmers Coop. Soc., 160 Iowa 194, 140 N.W. 844, (1913); Burns v. Wray Farmers' Grain Co., 65 Colo. 425, 176 P. 487 (1918); and cases cited in Maryland and Virginia Milk Prod. Asso. v. United States, 362 U.S. 458 n. 9, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960).

4. The House and Senate Committee reports on the bill which was subsequently enacted stated that, "In the light of previous decisions of the courts and in view of a possible interpretation of the law which would empower the courts to order the dissolution of such organizations and associations, your committee feels that all doubt should be removed as to the legality of the existence and operation of these organizations and associations, and that the law should not be construed in such a way as to authorize their dissolution by the courts under the antitrust laws or to forbid the individual members of such associations from carrying out the legitimate and lawful objects of their associations." H.R.Rep.No.627, 63rd Cong., 2d Sess. 16 (1914); S.Rep.No.698, 63rd Cong., 2d Sess. 12 (1914).

5. 62 Cong.Rec. 2261–2262 (1922).

that conditions . . . (in 1922) . . . . were such that the agricultural producer was at the mercy of speculators and others who fixed the price of the selling producer and [the purchasing price of] the final consumer through combinations and other arrangements, whether valid or invalid, and that by reason thereof the former obtained a grossly inadequate price for his products." Furthermore, some farmers felt that they could not organize successfully in the manner permitted by Section 6 of the Clayton Act because they "need a capital and must have the privilege of paying dividends." [6]

In an attempt to improve the economic situation of farmers, Congress in 1922 enacted the Capper-Volstead Act, which gave protection from the antitrust laws to a broader class of agricultural cooperatives than did the Clayton Act, and which enumerated specific types of conduct that cooperatives could legitimately engage in. With certain provisos, cooperatives could engage in "collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce"; the associations were generally permitted to "have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes."[7]

Although one aim of Capper-Volstead was to authorize farmers to organize into associations with capital stock, perhaps the most significant purpose of the statute was to make it clear that farmers could operate collectively for purposes of marketing as well as for preparing for market. The hope was that farmers would then be placed in economic circumstances comparable to those afforded businesses and other large industries. As stated by Senator Kellogg, "The Capper-Volstead bill was designed simply to give the growers or the farmers the same opportunity for successful organization and distribution of the products that the great corporations of America have enjoyed for many years . . . the growers must have an opportunity to merchandise their products in an orderly way instead of being compelled to dump them on a glutted market at prices below the cost of production." [8]

The Senator also noted that " . . . This (marketing) requires study, experience and cooperation among the farmers . . . (with) their agents who understand the market, know where to ship, when to ship and what kind of food to ship." [9]

The Supreme Court concluded from this legislative history that one purpose of Capper-Volstead was "to make it possible for farmer-producers to organize

---

6. H.R.Rep.No.939, 66th Cong., 2d Sess. 1 (1920).

7. Section 1 of the Capper-Volstead Act reads as follows:

"Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes: Provided, however, That such associations are operated for the mutual benefit of the members thereof, as such producers, and conform to one or both of the following requirements:

"First. That no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein, or,

"Second. That the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum.

"And in any case to the following:

"Third. That the association shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members." 7 U.S.C. § 291.

8. 62 Cong.Rec. 2058 (1922).

9. 62 Cong.Rec. 2052 (1922).

together, set association policy, fix prices at which their cooperative will sell their produce, and otherwise carry on like a business corporation without thereby violating the antitrust laws." Maryland and Virginia Milk Producers Association v. United States, 362 U.S. 458, 466, 80 S.Ct. 847, 853, 4 L.Ed.2d 880 (1960).

The legislative history of the Capper-Volstead Act indicates that its liberal provisions were intended to apply only to cooperatives composed of agricultural producers, and not to combinations of any other individuals in the agricultural industry. The Act's provisions for cooperative "processing" and "preparing for market" apply only to such conduct when performed by the farmers' association. During the Senate discussion of the bill Senator Kellogg stated, "the bill covers farmers, people who produce farm products of all kinds  .  .  . (P)ackers or manufacturers  .  .  . are not farmers or producers of the products  .  .  . (T)he object of the provision permitting cooperative processing and preparing, of course, was to confine these privileges to the cooperative associations of farmers who not only produce but prepare their production, like oranges, for the market  .  .  ." [10]  In response to the question of whether processing under the statute would include shelling corn, Senator Kellogg said, "Undoubtedly if the farmer's cooperative association did it  .  .  . It includes the processing by the farmer's own association of the product which the farmer himself produces." [11]

The House Report on the bill is consistent with Senator Kellogg's analysis. The Report states that the provisions of the bill "are aimed to exclude from the benefits of this legislation all but actual farmers and all associations not operated for the mutual help of their members as such producers." [12]  During the Senate debate on the bill an amendment was proposed to extend its protection to associations of manufacturers "where any such agricultural product or products must be submitted to a manufacturing process in order to convert it or them into a finished commodity and the price paid by the manufacturer to the producer thereof is controlled by or dependent upon the price received by the manufacturer." [13]  While such protection for non-producers might indirectly benefit the farmer, Senator Kellogg opposed it on the ground that the Congress "should not permit a manufacturer of any product  .  .  . agricultural or otherwise, to get a bigger profit from the consumer on his product if he will agree to pay a part of the swag to the man who produces it." [14]  The Senate rejected the proposed amendment.

This Court, cognizant of the social and legislative history of the Act, must now determine whether the present organizational structure of defendant Sunkist falls within its scope.

Sunkist Growers, Inc. is an outgrowth of the informal Boards of Exchange and Executive Board organized in Southern California in 1893. These informal District Boards were soon incorporated as cooperative corporations by their members and were thereafter known as "District Exchanges". The functions of the Executive Board, incorporated as the Southern California Fruit Exchange and later dissolved, were assumed by the California Fruit Growers Exchange which in 1952 changed its name to Sunkist Growers, Inc.

Since the time of its formation, Sunkist's primary function has been that of selling its members' fruit. Although its Research Department offers technical advice to farmers on insect control and related matters, Sunkist is not directly

---

10. 62 Cong.Rec. 2052–2053 (1922).

11. *Id.*

12. H.R.Rep.No.939, 66th Cong.2d Sess. 1 (1920).

13. 62 Cong.Rec. 2275 (1922).

14. *Id.*

involved in the growing of citrus fruit. The grower is responsible for choosing what, when and where to plant and for bringing his fruit to maturity.

The individual grower also selects the type of packing facility in which his fruit will be prepared for market. He may use his own packing facilities. He may use the facilities of a cooperatively owned packing house, termed a "local cooperative", which is owned and controlled by the grower members who use it. Or, he can contract for the services of a privately owned packing house. Prior to Sunkist's 1968 reorganization, these privately owned packing houses were termed "agency houses"; now they are called "licensed packers".

Membership in Sunkist compels a grower to market through Sunkist all the fruit produced by the groves designated in his contract with Sunkist. Sunkist is responsible for the disposition of the fruit after it is packed, marketing it either as fresh or product fruit. It maintains facilities for processing fresh citrus fruit to yield industrial concentrates of juices and oils, consumer products of single strength juice or of concentrated juices, and peel and residual products. If fruit is to be used for such processing, it is shipped from the packing houses to the appropriate processing facility. The defendant markets the fresh fruit of its members on a nationwide basis and maintains approximately 40 sales offices throughout the country for this purpose. When a sale of fresh fruit has been arranged by Sunkist, it is shipped to the customers from the packing house. Fruit may also be shipped to auction markets or exported.

Marketing opportunities within the Sunkist system are made available on an equal basis to all of its members subject to the availability of fruit and the requirements of the buyers. Most costs of operating the system are apportioned among the members in proportion to the value or amount of fruit marketed through the Sunkist system, although certain charges such as freight are allocated directly to the producer. When sales are completed, the net proceeds are distributed to Sunkist members.

At the time of the Supreme Court decision in this case, although each grower whose fruit was marketed through Sunkist was affiliated with a packing house facility which was a member of Sunkist, with the exception of those growers who had their own facilities, individual growers were not members of Sunkist. The lowest level members of Sunkist's pyramidal structure were the packing houses, whether cooperatively owned "local cooperatives", privately owned "agency houses" which contracted with growers to provide packing services for cost plus a fixed fee, or a grower's personally owned packing facility. The operator of each packing house was a member of the District Exchange for his area. The various District Exchanges jointly elected the directors of Sunkist. The packing houses shared in the capital funding of Sunkist in proportion to the amount of fruit from the individual packing house marketed by Sunkist, and held all property rights in Sunkist in proportion to their capital contributions.

Under this organizational structure, a grower who owned his own packing facilities was represented in the Sunkist system at the District Exchange level and was, for all practical purposes, a member of Sunkist. The growers who were members of local cooperatives were also represented at the District Exchange level, although to a lesser extent; the operator of the local cooperative who was also a member of the District Exchange was presumably selected by the growers to represent them. The growers who contracted with private packing houses, however, were clearly not members of the Sunkist system nor represented in the organization in any meaningful manner.

It was on the basis of this non-grower membership in Sunkist that the Supreme Court held that the organization was not protected by the Capper-Vol-

stead Act.[15] The Court's decision cited extensive legislative history which indicated that the Act's protection was to extend only to agricultural producers and not to those handling the produce between the points of production and consumption. The Court summarized its conclusion by stating that "the issue is whether Sunkist is an association of '[p]ersons engaged in the production of agricultural product as . . . fruit growers' within the meaning of the Capper-Volstead Act, notwithstanding that certain of its members are not actually growers. We hold that it is not." Case-Swayne Co. v. Sunkist Growers, Inc., 389 U.S. 384, 386, 88 S.Ct. 528, 530, 19 L.Ed.2d 621.

The 1968 reorganization changed the Sunkist structure significantly. Diagrammatically simplified, the basic structure is as follows:

*These growers are grouped into "voting units" for purposes of voting and other matters.

At the base of Sunkist's representative membership structure are the individual growers. These growers must have one of two other affiliations: They may join a local cooperative, called a Local Association in the 1968 by-laws, which in turn is a member of the District Exchange for its geographical area; or, they may become members of the District Exchange for their region directly. Growers who are direct members of their District Exchange pack their fruit themselves or contract with a local cooperative or privately owned licensed packer to do so. The Local Associations arrange for the packing of their members' fruit.

The District Exchanges, which are thus composed of growers who join directly and Local Associations, are regional marketing agencies and each of the various Exchanges is responsible for marketing the fruit of the Sunkist members within its region. The District Exchanges also elect the directors of Sunkist, but have no other voting rights.

Growers who are members of local cooperatives exercise their right to vote on Sunkist matters representatively, through the election of representatives of their Local Association. Growers who are not members of local cooperatives are grouped into "voting units" which elect directors to represent them. Voting on all matters other than the election of directors of Sunkist is then exercised by the Local Associations and the directors nominated by the various "voting units". The number of votes exercised by each Local Association or "voting unit" is determined by the volume of fruit marketed by that association or unit through Sunkist.

Each grower shares in the capital funding of Sunkist either through his local cooperative (if he is a member of one) or directly. Contributions to capital are made on the basis of the volume of fruit marketed by Sunkist for the grower in a specified number of preceding years.

In contrast to the pre-1948 system where property rights were held by the packing houses in proportion to their contribution to Sunkist's revolving or

---

15. An earlier decision, Sunkist Growers, Inc., et al. v. Winkler and Smith Citrus Products Co., 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962), implied that Sunkist was a cooperative organized in compliance with Section 1 of the Capper-Volstead Act. In its decision in the present case, the majority of the Ninth Circuit interpreted *Winkler* to have so held. Case-Swayne Co. v. Sunkist Growers, Inc., 369 F.2d 449, at 460. However, the parties in *Winkler* apparently conceded that Sunkist was covered by the Capper-Volstead exemption, and so that issue was never specifically discussed by the Court.

capital fund, under Sunkist's current organization, grower members possess all the property rights in Sunkist in proportion to the fruit marketed by each grower.

Under both Sunkist's present and its pre-1968 organization, the District Exchanges are delegated the right to select the markets and prices at which its members' fresh fruit is to be sold, with the proviso that this delegation of authority can from time to time be terminated. Under the pre-1968 organization, however, the "reserved right" to choose markets and set prices was held by the packing houses, whether privately or cooperatively owned. Under the post-1968 organization, this right is held by the growers' local cooperative or voting unit.

The new structure eliminates from Sunkist membership the agency houses that were the subject of earlier judicial frowning. The licensed packing houses which are presently under contract with the grower or local cooperative, and with the District Exchange and Sunkist, are not members of Sunkist (unless the grower and the packer are the same person) and have no vote, control or property rights in Sunkist.

Thus, under Sunkist's present organization no one can be a member of Sunkist at any level who is not a grower of citrus fruit or a cooperative association of such growers. It has been suggested that a privately owned packing house could obtain an interest in Sunkist by providing a grower member with the money he needs to make his required capital contribution to Sunkist in exchange for the grower's assignment to the packing house of a portion of the net proceeds he is later to receive from Sunkist for his fruit. This sort of involvement of non-producers in agricultural cooperatives is not prohibited by the Capper-Volstead Act. The Act specifically provides that "such associations and their members may make the necessary contracts and agreements to effect (their) purposes." Section 1 of the Capper-Volstead Act (7 U.S.C. § 291). Furthermore, the Congressional debates preceding the passage of the Act specifically recognized that producers who desired to organize collectively might not have the necessary finances to do so and might therefore seek capital from non-producers.[16] In addition, Sunkist's by-laws insure that the only right of membership that can be assigned is the right to capital credits. Neither voting rights nor any other right incident to membership may be voluntarily or involuntarily transferred or encumbered.[17] Thus, there is no risk that non-producers may, by providing money to growers or by any other means, obtain sub rosa membership or positions of potential influence in the Sunkist system.

Thus in theory and in operation the Sunkist organization presently complies with Capper-Volstead. It is non-profit. Its membership is limited to growers and cooperative associations of growers. Its voting rights are exercised directly or indirectly by the grower members, and no right to vote, control or participate in policy-making is in the hands of a non-grower. This Court therefore concludes that, in contrast to the organizational structure existing at the time of the Supreme Court decision in this suit, Sunkist's present structure constitutes an agricultural cooperative protected by Section 1 of the Capper-Volstead Act.

16. See 60 Cong.Rec. 365 (1920) (remarks of Senator Walsh); 62 Cong.Rec. 2271 (1922) (remarks of Senator Walsh); 62 Cong.Rec. 2273 (1922) (remarks of Senator Norris); hearings on H.R. 2373 before a Subcommittee of the Senate Judiciary Committee, 67th Cong., 1st Sess.

(1921). See also Case-Swayne Co. v. Sunkist Growers, Inc., 389 U.S. 384 at 395, 88 S.Ct. 528, 19 L.Ed.2d 621.

17. Sunkist Growers, Inc. Amended Articles of Incorporation and By-Laws, effective July 16, 1968, No. 2.7.