**UNITED STATES of America,**
**Plaintiff,**

**v.**

**REED ROLLER BIT COMPANY, American Machine & Foundry Company, and AMF American Iron, Inc., Defendants.**

**Civ. No. 66–248.**

United States District Court
W. D. Oklahoma.

June 23, 1967.

Raymond P. Hernacki, John T. Cusack, Paul D. Carrier, U. S. Dept. of Justice, Chicago, Ill., for plaintiff.

James E. Work, of Shirk, Withington, Work & Robinson, Oklahoma City, Okl., Herbert A. Bergson and Samuel H. Seymour, of Bergson & Borkland, Washington, D. C., for defendant American Machine & Foundry Co.

Coleman Hayes, of Monnet, Hayes, Bullis, Grubb & Thompson, Oklahoma City, Okl., John C. Snodgrass and John L. Murchison, Jr. of Vinson, Elkins, Weems & Searls, and C. M. Kucera, Houston, Tex., for defendant Reed Roller Bit Co.

OPINION or MEMORANDUM
of DECISION

EUBANKS, District Judge.

On June 21, 1966, the United States instituted this action pursuant to section 15 of the Act of Congress of October 15,

1914 (38 Stat. 736; 15 U.S.C. § 25), as amended, commonly known as the Clayton Act, against Reed Roller Bit Company, American Machine & Foundry Company, and AMF American Iron, Inc., and alleged that the acquisition of AMF American Iron, Inc., by Reed Roller Bit Company violated section 7 of the Clayton Act (15 U.S.C. § 18). Section 7 provides in pertinent part as follows:

[That] [n]o corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

Simultaneously with the filing of this suit the Government sought a preliminary injunction pursuant to Section 15 of the Clayton Act (38 Stat. 736; 15 U.S.C. § 25) to preliminarily enjoin defendant Reed Roller Bit Company and its agents from taking any actions which would alter in any way either the production facilities or the labor and management staff and which would enjoin defendant American Machine & Foundry Company from taking any action which would render it more difficult for AMF American Iron, Inc., to resume its operations.

On the motion of defendant Reed Roller Bit Company pursuant to Rule 65(a) (2) of Federal Rules of Civil Procedure, the Court, with the Government's consent, consolidated the hearing on the Government's motion for a preliminary injunction and the trial on the merits. The trial of the case on the merits began on September 21, 1966, and after a recess concluded on November 8, 1966. At the conclusion of this trial, on motion of defendant Reed Roller Bit Company

the Court, with the consent of defendant American Machine & Foundry Company and the Government, appointed a Special Master to inquire into and report on numerous features of this case. The report of the Special Master was filed with this Court on March 16, 1967.

*The Defendants*

Reed Roller Bit Company (now G. W. Murphy Industries, Inc., but hereafter referred to as "Reed") is a corporation organized and existing under the laws of the State of Texas, and maintains its principal office and plant in Houston, Texas. As a manufacturer of certain oil well drilling equipment, Reed's primary product is rock bits. In 1965 Reed's rock bit sales amounted to $11,189,000 and accounted for approximately 12.6% of this market, making Reed the nation's fourth largest rock bit manufacturer. In the oil well drilling equipment field, Reed also manufactures tool joints and drill collars. In addition, Reed manufactures pneumatic tools and accessories, cast tungsten carbide products and oil metering devices. In addition to its principal plant, Reed maintains warehouse and service plants in Arkansas, Kansas, Oklahoma, California, Louisiana, Texas, Illinois, New Mexico, Wyoming, Mississippi, Edmonton, (Alberta) Canada, Leiden (Netherlands), and Salvador, Bahia (Brazil). In 1965 Reed's total sales amounted to approximately $41,140,000.

American Machine & Foundry Company (hereafter referred to as AMF) is a corporation organized and existing under the laws of the State of New Jersey, is a manufacturer of products including automatic pin spotting bowling machines, bicycles, bakery machinery, beverage dispensers, water purification systems, and various recreational supplies and equipment, food and tobacco processing machinery, and railroad tank and hopper cars. In 1955, AMF acquired American Iron & Machinery Works Company, a manufacturer of oil field drilling

and production equipment, located in Oklahoma City, Oklahoma, which thereafter operated as a wholly owned subsidiary of AMF under the name "AMF American Iron, Inc." In 1965, AMF consolidated sales and rentals totaled approximately $385,000,000.

AMF American Iron, Inc. (hereafter referred to as "American Iron") was a corporation organized and which existed under the laws of the State of Delaware until it was dissolved on January 18, 1966. American Iron's 1964 total sales amounted to approximately $6,400,000. American Iron's product line included fluid end expendable parts (including pistons, rods, and liners), catheads (a type of winch), fishing tools, rig equipment, and various types of production tools. American Iron also manufactured and sold tool joints and drill collars. While American Iron was named as a defendant, it was not served and did not answer, and it is not treated as a defendant in this case by the plaintiff.

## THE ACQUISITION

AMF became dissatisfied with the economic performance of American Iron, and in 1959–60 AMF retained a business broker for the purpose of disposing of American Iron. Numerous prospects, including Reed, made studies of American Iron. However, there were no concrete offers. As will be discussed below, from AMF's standpoint, the economic performance of American Iron became increasingly unsatisfactory after 1959–60. Because of this condition, in 1965 Reed concluded that AMF would be receptive to offers to purchase the assets of American Iron. Reed's primary purpose in making the acquisition was to broaden its product line by the inclusion of the lines of oil well drilling equipment manufactured and sold by American Iron but not manufactured or sold by Reed. These non-competing lines accounted for approximately 50% of American Iron's gross sales and included primarily fluid end expendable parts. Although the

fluid end expendable parts were the primary non-competing line that Reed desired to acquire, American Iron also had other non-competing lines such as catheads (a type of winch), tongs, (performing the functions of a large wrench), kellys (a device that turns the drill pipe), power slips (a pipe gripping device), fishing tools (used to recover lost objects from the drilling hole), and other rig equipment and production tools were manufactured and sold by American Iron and were not competitive with Reed's lines. American Iron was a competitor of Reed in two lines: tool joints and drill collars.

When AMF was notified by its bank that Reed was a prospective purchaser, it assumed that Reed was merely seeking to obtain confidential information concerning American Iron's operation. This assumption was based on the fact that when AMF had previously attempted to sell American Iron, Reed had made inquiries in order to engage in such a fishing expedition. When AMF concluded that Reed's overtures were sincere, negotiations were begun. On or about November 2, 1965, Reed agreed with AMF to acquire all of the assets of American Iron for the sum of $4,100,000. This agreement was consummated and final payment was made on or about December 16, 1965.

The acquisition, while not highly publicized, was not a secret transaction. It was well known to persons and companies involved in the drilling equipment and related industries and was reported in at least one trade publication. The evidence reveals that before making the purchase Reed discussed the acquisition with its customers in order to obtain their reaction. American Iron employees were notified of the proposed merger in November, 1965 and no suggestion was made that the transaction was secret.

■ In an action brought under section 7 of the Clayton Act the basic questions are:

(1) The relevant geographic market (or "section of the country"); (2) the

relevant product market (or "line of commerce"); (3) the effect on competition within those relevant markets (where the effect "may be substantially to lessen competition"); and (4) where violation is found the appropriate relief to be ordered.

### RELEVANT MARKETS

The parties have agreed that the United States as a whole is the geographic market for the production and sale of both tool joints and drill collars and that in this nation-wide market the effects of the merger are to be measured.

The parties have also agreed that the two lines of commerce or relevant product markets in which competition may be injured are the manufacture and sale of tool joints and drill collars.

### EFFECT OF THE ACQUISITION

The great bulk of oil drilling in the United States is now accomplished by rotary drilling rigs. These rigs generally include at the lower end, a rock bit, a number of drill collars, many sections of drill pipe connected by tool joints and a "kelly" rotary drive stem at the drill floor. Tool joints and drill collars are essential to the modern method of oil well drilling. As a practical matter, the oil well drilling industry provides the exclusive market for tool joints and drill collars.

A "tool joint" is a coupling by which the numerous 30-foot lengths of drill pipe are connected. There are two types of tool joints in this country today—flash welded and threaded—the former accounting for the great bulk of the market.

Drill collars are heavy 30-foot lengths of heat treated alloy steel, drilled axially and integrally threaded, and joined in an assembly to furnish weight for the lower end of a rotary oil well drilling string, which weight forces the rock bit into the land formation and tends to stabilize the drilling string. Drill collars are manufactured by drilling a hole in a 30-foot length of heat-treated steel bar and by threading each end of the bar.

The determination of the section 7 legality of a horizontal merger requires an evaluation of the basic facts relating to the number of companies in the appropriate relevant geographic and product markets and percentage shares of the parties to the merger. Thus the Government introduced detailed evidence regarding concentration and percentage shares in the tool joint and drill collar lines of commerce and the effect of the acquisition on concentration and these shares.

The flash welding of tool joints requires special equipment. A new flash welding machine with appropriate equipment installed in suitable quarters costs from approximately $400,000 to $750,000. In 1965, the demand for tool joints required only five flash welding machines in the United States. These were owned as follows:

| Number of Machines | Owner | Location |
|---|---|---|
| 2 | Hughes Tool Company | Houston, Texas |
| 1 | Reed Roller Bit Company | Houston, Texas |
| 1 | AMF American Iron, Inc. | Oklahoma City, Okla. |
| 1 | National Supply Division, Armco Steel Corporation | Ambridge, Pennsylvania |

The 1965 sales of all tool joints in the United States of Hughes, Reed, American Iron, and National Supply Division of Armco Steel Corporation amounted to approximately $10,657,106 which was approximately 95% of all tool joints sold in the United States.

American Iron was the third largest producer and seller of tool joints in the United States. In 1965 American's sales in the United States and share of the total domestic industry sales were as follows:

|  | 1965 Approximate Sales | Approximate Per Cent of Total Industry Sales |
|---|---|---|
| Flash welded tool joints | $1,356,000 | 14 |
| Threaded and other non-flash welded tool joints | 31,000 | 2 |
| Total tool joints | $1,387,000 | 13 |

Reed was the second largest producer and seller of tool joints in the United States. In 1965 Reed's sales in the United States and share of total domestic industry sales were as follows:

|  | Approximate Sales | Approximate Per Cent of Industry Sales |
|---|---|---|
| Flash welded tool joints | $3,356,000 | 36 |
| Threaded and other non-flash welded tool joints | 392,000 | 26 |
|  | $3,748,000 | 35.2 |

In 1965 there were seven significant producers and sellers of drill collars in the United States whose sales in this country totaled approximately $7,752,670 or approximately 96 per cent of the total sales in this country. American Iron was the fifth largest producer and seller of drill collars in the United States. In 1965 American Iron's sales in the United States and share of total domestic industry sales were as follows:

|  | Approximate Sales | Approximate Per Cent of Industry Sales |
|---|---|---|
| Drill Collars | $842,000 | 10.4 |

Reed was the second largest producer and seller of drill collars in the United States. In 1965 Reed's sales in the United States and share of total domestic industry sales were as follows:

|  | Approximate Sales | Approximate Per Cent of Total Industry Sales |
|---|---|---|
| Drill Collars | $1,580,000 | 19.6 |

———◆———

The controlling decision of the Supreme Court with regard to an analysis of such market data is United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). There the Court stated that a horizontal merger should be condemned if it:

"produces a firm controlling an undue percentage of the relevant market, and results in a significant increase in the

concentration of firms in that market * * * in the absence of evidence clearly showing that the merger is not likely to have * * * anticompetitive effects."

■ In *Philadelphia National Bank* the Court condemned the merger of the second and third largest banks in the relevant market resulting in a combination controlling 30% of the commercial banking business in that market. Other decisions have demonstrated that where the industry is already concentrated or there are trends toward concentration, mergers resulting in even smaller market shares may be unlawful. E. g., United States v. Aluminum Company of America, 377 U.S. 271, 277–278, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); and United States v. Von's Grocery Co., 384 U.S. 270, 277, 86 S.Ct. 1478, 16 L.Ed. 2d 555 (1966).

■ In the present case the merger of the second and third largest producers and sellers of tool joints eliminates one of four flash welded tool joint manufacturers, and would rank the Reed-American Iron combination first in the industry with approximately 48% of the total market. * * * * * Likewise, the marger of two of the largest five producers and sellers of drill collars eliminates one of seven significant producers and sellers of drill collars (having approximately 96% of the total U. S. sales), and produces a combination that would rank second in the industry with approximately 30% of the total United States market. Accordingly, this Court finds that the acquisition by Reed of the tool joint and drill collar operations of American Iron is unlawful.

Reed takes the position that there is evidence that prevents the merger from being unlawful. It urges that in the Supreme Court's landmark decision in Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Court balanced its finding of illegality with the conclusion that there may be "mitigating factors" that would save a merger:

"[S]uch as the business failure or the inadequate resources of one of the parties that may have prevented it from maintaining its competitive position * * * [or] a demonstrated need for combination to enable small companies to enter into a more meaningful competition with those dominating the relevant markets." 370 U.S. at 346, 82 S.Ct. at 1535.

Likewise, the Court had stated that the statute was not to impede a merger resulting in a concern that could compete more effectively, or "a merger between a corporation which is financially healthy and a failing one which no longer can be a vital competitive factor in the market." (370 U.S. at 319, 82 S.Ct. at 1521.) The Court further noted that the condemned merger did not produce "any countervailing competitive, economic, or social advantages" (370 U.S. at 334, 82 S.Ct. at 1529). Reed further asserts that subsequent decisions of the Court such as United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), have mentioned that defenses such as a "failing firm" could have application and noted that the parties were "healthy and strong; they are not undercapitalized or over-loaned; they have no management problem; the Philadelphia area is not over-banked; ruinous competition is not in the offing." Emphasizing that the Supreme Court's decisions under section 7 have involved vigorous and healthy concerns operating in expanding industries, Reed argues that there are numerous economic benefits accruing from the merger of companies engaged in unhealthy and declining markets. In this connection, it asserts that the Supreme Court has not limited the often-mentioned "failing firm" defense to situations involving officially or clear-cut insolvent or bankrupt concerns. It argues that the principle of the considerations favoring the failing firm doctrine is equally applicable in a situation where a company has experienced very unsatisfactory performance, can no longer maintain its competitive position, and will

not be a significant competitive factor in the market. In support of its broad failing or declining firm defense, Reed presented detailed economic evidence in an attempt to show that the acquisition in question has "mitigating factors." The following outlines the basis of Reed's contention and sets forth the facts that this Court believes are amply supported by the evidence.

## A. *Decline of the Domestic Drilling Industry.*

Before 1955, AMF had no significant interest in the petroleum equipment industry. In that year, however, a decision was made to enter into the manufacture and sale of oilfield drilling equipment and AMF acquired the assets of American Iron, a company that was primarily engaged in the production of fluid end expendable parts, tool joints and drill collars. Virtually the entire demand for these products comes from oil and gas drilling contractors. Approximately 85% of American Iron sales were in the domestic market, and the success of the company depends upon the prosperity of the domestic drilling industry which, in turn, depends upon the health of the domestic oil and gas producing industry.

Neither party attempted to introduce evidence relating to industry sales for tool joints and drill collars over a period of years. Substantial amounts of evidence were, however, introduced relating to drilling activity. By and large, if productivity is taken into consideration, the trend in drilling activity is, in the opinion of the Court, persuasive evidence as to the trend in the sale of tool joint and drill collars—products that have practically their only use on the drilling rig.

In contrast to the general economic prosperity enjoyed in the last decade by the nation as a whole, drilling activity has suffered sharp declines in recent years both in terms of the number of wells completed and the total footage drilled. For example, in 1966, 9,466 exploratory wells were drilled. This may be compared with 13,178 exploratory wells drilled in 1959, 16,207 in 1956, and 13,100 in 1954. Additionally, there were 28% fewer development wells drilled in 1966 than were drilled in 1954. The decrease in rig activity is even more substantial. In 1957 there were 2,429 rotary rigs active in the domestic drilling market. This figure has steadily declined: In 1958 there were 1,923 rigs; in 1959 there were 2,074 rigs; in 1960 there were 1,750 rigs; and in 1962 there were 1,636 rigs; in 1964 there were 1,502 rigs; and in 1966 there were 1,273 rotary rigs active in the United States. This diminished drilling activity is also reflected in the total footage drilled. In 1957 there were 223,087,000 feet drilled as compared with 190,703,000 in 1960, 184,357,000 in 1963, and 159,377,000 in 1966. The decline in domestic drilling activity is a result, largely of substantial increases in oil imports and the industry opinion that the price for oil and gas is too low to justify continuation of past levels of exploration activity. Without respect to the merits of the justifications given for the decline in drilling activity, there can be no doubt that this has occurred, and that there is no basis for predicting an increase in drilling activity.

The effect of this decline has necessarily been to decrease the demand for tool joints and drill collars. Simultaneous with this decrease in demand, the productivity of these products has been considerably increased by the tool joint and drill collar manufacturers. The evidence reveals that in the last ten years the economic life of a string of drill pipe with tool joints attached has increased 100 to 150%.

At the same time that the domestic drilling activity has suffered the decline described above the midcontinent area, which American Iron was best able to serve, has experienced even greater decreases in drilling activity. From 1956 to 1965 the number of wells completed in the midcontinent area has decreased 46%. During the same period of time the number of exploratory wells com-

pleted has declined approximately 57%. In 1965 there were 141 operating rotary rigs in Oklahoma as compared to 243 rigs in 1957. The rig count today is less than 100. Decreased exploratory activity will be followed by decreased drilling of development wells. While the mid-continent area has experienced the above-described decline in drilling activity, the Texas-Louisiana Gulf Coast area has experienced relatively stable drilling activity and in some recent years there have been small increases.

B. *The Position of American Iron.*

In 1955 when AMF acquired American Iron, American Iron had a sales volume of approximately $9.5 million. In 1956 its sales had increased to about $10 million. As a result of the decline in drilling activity described above, American Iron suffered loss years in 1958 and 1960. In 1962, the company had earnings of $27,480 on $6,178,072 total sales. In 1963 it incurred a loss of $70,037 on $6,081,387 total sales; in 1964 it had a profit of $166,091 on $6,-412,069 total sales; and in the first ten months of 1965 American Iron had earnings of $104,001. The tool joint and drill collar operations have been particularly unsuccessful. For example, the drill collar operation produced a $157,-699 loss in 1964 and $126,840 loss during the first ten months of 1965. The tool joint operations produced profits of $10,-908 in 1964 and produced a loss of $6,790 during the first ten months of 1965. Thus, in 1962 American Iron's pretax return on assets employed was .5%; in 1963 this return was a loss of 1.5%; in 1964 this return was 4.3%; and for the ten months ended October 31, 1965, the rate of return was 3.1%.

The decline in American Iron's performance was attributable in large part to the decline in drilling activity—the industry providing the sole market for tool joints and drill collars. Because of its geographical location American Iron has suffered much more from diminished drilling activities than have the other manufacturers in these markets. American Iron definitely does not have as good a location to serve the Texas-Louisiana Gulf Coast markets as do most other manufacturers of the products here involved. The same is true with respect to foreign sales. At a minimum, American Iron incurred annual freight absorption costs of $25,000.

As a consequence of its unsatisfactory performance, American Iron began a program of "retrenchment". The number of sales personnel was reduced to 25 and more importantly its research and development efforts were practically eliminated.

The aspect of American Iron's operation that has been given most emphasis by defendants is the absence of an adequate supply of drill pipe. In order to understand this contention it is necessary to briefly review the marketing process relating to tool joints and drill pipe. Drill pipe is, of course, the equipment to which tool joints are attached. The major manufacturers of drill pipe are the major steel companies. Prior to 1966, the steel companies sold the drill pipe to supply houses which are the major sellers of drilling equipment to the driller. The supply houses maintained the stock of drill pipe that they had acquired in the storage yards of the various tool joint manufacturers. When a supply house received an order for drill pipe it would notify a tool joint manufacturer (the one specified by the driller if one was specified) of the order. The tool joint manufacturer having possession of the supply houses' drill pipe would attach its tool joints to the drill pipe. The drill pipe with tool joints attached would then be shipped from the plant of the tool joint manufacturer. The availability of an adequate supply of each manufacturer's drill pipe was thus necessary to the operation of a tool joint manufacturer. Ordinarily, time is of the essence in the sale of drill pipe and tool joints and accordingly the sales must be made by a tool joint manufacturer having immediate access to a supply of drill pipe.

Not long before the merger, a change in the system of marketing occurred. The major steel companies began marketing the pipe by storing the pipe themselves in the yards of the tool joint manufacturers in Houston. From the standpoint of the tool joint manufacturer, this was essentially the same arrangement as existed under the earlier practice when the supply house owned the drill pipe. As a practical matter, the only difference is that the steel companies owned the drill pipe stored in the yards of the tool joint manufacturer, rather than the supply houses.

The critical difference between the present system of marketing and that existing prior to 1966 is that the major steel companies—United States Steel, Pittsburgh Steel Company, Armco Steel Corporation, Youngstown Sheet and Tube Company, and Jones & Laughlin Steel Company—concluded that the demand for drill pipe in the Oklahoma City area was not sufficient to justify storing drill pipe with the tool joint manufacturer there, American Iron. The steel companies arrived at this decision on the basis of the same economic data discussed above relating to diminished drilling activity in the area. Their experience was that the very low turnover rate on drill pipe could not economically justify the maintenance of pipe inventories in Oklahoma City.

As a result, the American Iron tool joint operation in Oklahoma City, which had always had difficulty gaining access to an adequate supply of drill pipe, was faced with the prospect of losing practically all of its sales. Without the supply of drill pipe in its yards, supply houses in the area selling drill pipe would order the pipe through Houston, Texas, where the drill pipe was located. There the Houston tool joint manufacturers would attach the tool joints to the drill pipe and ship them into the midcontinent area. The supply houses in the midcontinent area, many of which are owned by the steel companies manufacturing drill pipe, would continue to sell the drill pipe of the manufacturers electing to maintain supplies of drill pipe only in Houston, Texas. They will not buy the drill pipe since this would be an unnecessary inventory expense.

As noted earlier, the decision of the steel companies was based on the substantial decline in drilling activity and the absence of any prospects for improvement. Should the demand for drill pipe increase substantially, steel companies would of course react by storing drill pipe in Oklahoma City. The evidence reveals, however, that at the present time the steel companies do not foresee an improvement in the drilling activity and do not plan to store drill pipe in Oklahoma City. Thus, because of conditions beyond its control—the availability of a supply of drill pipe—American Iron was faced with the loss of most of its tool joint sales. Since the acquisition and during the period of continuation of the American Iron plant, on several occasions Reed has unsuccessfully tried to induce the steel companies to stock drill pipe in Oklahoma City by offering to defray their freight charges.

During the trial the most serious factual disagreement between the Government and the defendants related to the availability of drill pipe in Oklahoma City and the ability of the American Iron operations to be maintained there. The Government took the position that the tool joint operations could be and should be maintained in Oklahoma City. Its evidence in that regard was not persuasive. Since the trial, the Government has altered its position and now "concedes that the [lack of an adequate stock of drill pipe in Oklahoma City] would probably necessitate transfer of the tool joint operations to the Houston area." Thus the Government conceded the undesirability of Oklahoma City as a locale for tool joint and drill collar operations and agreed to the removal of the American Iron tool joint and drill collar facilities to Houston, Texas.

In contrast to Reed's position, the Government makes a number of contentions, and the following facts are amply

supported by the evidence. Although the profits were small at the time of the acquisition, American Iron was earning a profit. While the company has experienced losses, it did have a net income in most years since AMF's acquisition. There is no doubt that the low return was not one that would attract capital, but at the same time there was not a net loss. In the five years preceding the acquisition American Iron had not found it necessary to borrow funds from the parent organization. While American Iron sales dropped rather drastically from the mid 1950's to the early 1960's, during the 1960's American Iron sales remained relatively constant. The number of hourly employees of American Iron actually increased from December 31, 1961, to December 31, 1965, and the number of salaried employees decreased only slightly. As earlier discussed, AMF had attempted to sell American Iron in 1959–60. There was no showing that AMF attempted to sell American Iron after 1960 until Reed expressed its interest. This was probably because American Iron conditions had grown steadily worse and AMF had concluded that there was no basis for trying to sell the business, particularly in light of the undesirable effect the earlier attempt had had on employee morale. Although it is not particularly surprising or important, AMF's annual reports fail to disclose critical comments concerning American Iron. The only comments made generally tended to be complimentary. The evidence reveals that American Iron's labor force was sufficient, its products were well regarded in the trade, and its general manager, Elmer Rueback, was regarded as a capable executive. In short, the evidence generally reveals that the primary difficulty with American Iron's operations were external and not attributable to the internal operations of the company.

The most significant disparity in the views of the parties is with regard to the scope of the failing firm defense. The Government rejects Reed's broad failing or declining firm defense and asserts that to come within the failing firm doctrine, a defendant must meet the strict conditions for the failing condition of the acquired company as set out in International Shoe v. Federal Trade Commission, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 (1930). In that case the failing company had sustained a $6 million loss in the year prior to the acquisition leaving a net treasury deficity of over $4,382,000. In the year of the acquisition, the company had debts in excess of $17 million, had suffered about 15% decline in production, had halted dividend payments on common and second preferred stock, and was discontinuing dividends on its first preferred stock, and would under Massachusetts law have to file an annual financial statement that would disclose a condition of official insolvency. The officers of the company had concluded that the only alternatives were liquidation through a receiver or outright sale. The Company could no longer pay its debts as they became due. Thus the Supreme Court held:

"In light of the case thus disclosed of a corporation with resources so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure with resulting loss to its stockholders and injury to the communities where its plants were operated, we hold that the purchase of its capital stock by a competitor (there being no other prospective purchaser), not with a purpose to lessen competition, but to facilitate the accumulated business of the purchaser and with the effect of mitigating seriously injurious consequences otherwise probable, is not in contemplation of law prejudicial to the public and does not substantially lessen competition or restrain commerce within the intent of the Clayton Act." 280 U.S. at 302–303, 50 S.Ct. 89, 93.

The Government further cites United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), the only case called to my attention decided by the Supreme Court involving the fail-

ing company doctrine since *International Shoe*. There the Supreme Court overturned a district court ruling that the defendant was entitled to a summary judgment under the failing firm doctrine because the Court found the record raised genuine issues of fact on two key findings that: (1) The acquired company was hopelessly insolvent and faced with imminent receivership and that (2) the acquiring concern was the only bona fide prospective purchaser for the acquired business.

■ Subsequent lower court decisions have demonstrated the necessity that the failing company be bankrupt or on the brink of bankruptcy, United States v. Maryland & Virginia Milk Producers Association, Inc., 167 F.Supp. 799 (D.D.C. 1958), rev'd in part on other grounds 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960), and the fact that the company had decided to liquidate is not enough to create a "failing company" situation unless the company's economic condition was as a practical matter beyond the prospect of rehabilitation. Erie Sand & Gravel Co. v. FTC, 291 F.2d 279 (3d Cir. 1961).

■ In the opinion of the Court, Reed's "failing firm" defense must fail. Although it is true that American Iron's poor performance made it a most unattractive subsidiary, it was not near bankruptcy, and it does not appear that it would have been in the absence of merger. The question is a close one, particularly in light of the fact that the tool joint operation would not have been able to continue in Oklahoma City and AMF had earlier decided it could not justify the capital outlay required to move it to Houston, Texas. Nevertheless, the case does not fit the traditional mold. While it is true that AMF had been unsuccessful in its earlier attempt to sell American Iron, the evidence does not show that Reed was the only prospective purchaser of the company. In summary, Reed has failed to carry its burden of showing that American Iron came within the strict test of *International Shoe*. Until the Supreme Court actually approves a merger on facts such as are involved in the present case, this Court is constrained to hold that the failing firm defense asserted by Reed is not applicable here.[1]

This is not to say that the evidence submitted with regard to the condition of the industry and the particular problems of American Iron is not important to this case, and it should be noted that it has important application to the question of relief.

## RELIEF

■ Having determined that the effect of the merger may be substantially to lessen competition in the tool joint and drill collar markets, the Court now turns to a determination of the appropriate relief. In the section 7 case of United States v. E. I. Du Pont de Nemours & Co., 366 U.S. 316, 323–324, 81 S.Ct. 1243, 1249, 6 L.Ed.2d 318 (1961), the Supreme Court stated:

"The proper disposition of antitrust cases is obviously of great public importance, and their remedial phase, more often than not, is crucial. For

---

1. Thus, it is unnecessary to decide whether the failing company doctrine extends to the sale of an unprofitable subsidiary of a prosperous parent company. It would seem that most of the justifications for the doctrine would be equally applicable to such a situation and that the doctrine if otherwise applicable should be applied, but see In the Matter of Farm Journal, Inc., 53 FTC 26 (1956), affirmed by the Commission, 53 FTC 52 (1956), where the hearing examiner found that a publication sold by Curtis Publishing Company to a competitor had been a losing venture while Curtis was making money from other ventures, and concluded that the merger was not protected by *International Shoe*. The examiner stressed the fact that Curtis could have "modernized" the publication or could have found other purchasers.

The fact that Reed's primary objective in acquiring American Iron was to obtain the fluid end expendable portion of the business has no relevancy to the legality of the merger or, for that matter, to the type of relief to be ordered.

the suit has been a futile exercise if the Government proves a violation but fails to secure a remedy adequate to redress it. \* \* \* If this decree accomplishes less than [an effective remedy] the Government has won a lawsuit and lost a cause."

Thus, the Court stated the standard to be followed in rectifying a section 7 violation.

"[T]he key to the whole question of an antitrust remedy is, of course, the discovery of measures effective to restore competition."

Under the Court's decision, the effectiveness of the remedy is the paramount consideration. The practicability and equitableness of the remedy may be considered and may be influential in selecting between two or more equally effective remedies. However, consideration of these factors will not permit a substitution of a less effective remedy for a more effective one.

Keeping in mind the above mandate of the Supreme Court, it is appropriate to note that courts of equity have broad remedial powers and "are clothed with 'the large discretion to model their judgments to fit the exigencies of the particular case.' International Salt v. United States, 332 U.S. 392, 400–401, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1946)." See also Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944). Moreover, it would seem that just as "[A] merger must be viewed in the context of the particular market involved, its structure, history, and probable future", United States v. Continental Can Co., 378 U.S. 441, 458, 84 S.Ct. 1738, 1748, 12 L.Ed.2d 953 (1964), these considerations must also be taken into account in determining the appropriate relief.

This case involves a merger of two companies that did not compete in all of the markets in which each was engaged. A discussion of the treatment that may be accorded a merger that is inoffensive with respect to some of the markets that are involved may be found in the Su-

preme Court's decision in Brown Shoe Co. v. United States, 370 U.S. 294, 335–338, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). There the court discussed the possibility of an acquisition where the competitive overlap of the merging companies is not complete. The absence of overlap discussed there related to geographical markets while in the present case the absence of competitive overlap relates to product markets. However, the principle expressed there should apply equally to this case. The court stated:

"The fact that two merging firms have competed directly on the horizontal level in but a fraction of the geographic markets in which either has operated, does not, in itself, place the merger outside the scope of § 7. That section speaks of 'any [indicated] \* \* \* section of the country,' and if anticompetitive effects of a merger are probable in 'any' significant market, the merger—at least to that extent—is proscribed. (370 U.S. at 337, 82 S.Ct. at 1530)

"To illustrate: If two retailers, one operating primarily in the eastern half of the Nation, and the other operating largely in the West, competed in but two mid-Western cities, the fact that the latter outlets represented but a small share of each company's business would not immunize the merger in those markets in which competition might be adversely affected. On the other hand, that fact would, of course, be properly considered in determining the equitable relief to be decreed. CF. U. S. v. Jerrold Electronics Corp. 187 F.Supp. 545 (E.D.Pa.[1960]), aff'd, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961)." (370 U.S. at 337 n. 65, 82 S.Ct. at 1530)

The Court seems to leave room for the possibility that the merger would be proscribed only to the extent of the competing lines—here tool joints and drill collars. However, regardless of the manner of describing the violation it would seem that the question raised by the Court's language is: How, or in what

manner, should the fact that some markets involved herein are not adversely affected be "properly considered" in determining the equitable relief to be decreed?

There is no doubt that under the *E. I. Du Pont II* decision, 366 U.S. 316, 81 S. Ct. 1243, 6 L.Ed.2d 318, proper consideration of the fact that a merger may not have anticompetitive effects in some markets would mean that divestiture may be confined to the operations in the markets adversely affected only where this form of divestiture is at least equally effective as any other form of relief. If it is equally or more effective, such divestiture of part of the assets may be appropriate. There are other reasons, as are discussed below, that support the granting of a partial divestiture, but these can have weight and are given weight only because partial divestiture on the facts of this case is equally as effective as the alternative remedies available.[2]

In the present case, the evidence shows and this Court is of the firm opinion that the inclusion of the "noncompeting" lines of commerce in the order of divestiture would not aid the restoration of competition in the tool joint and drill collar industries. Divestiture by Reed of the tool joint and drill collar operations will restore competition in these markets and is the form of relief best suited to this end.

The Government brought this action alleging anticompetitive effects in the tool joint and drill collar markets. Although American Iron was also engaged in other markets, principally the fluid-end expendable parts market, no allegation has ever been made that this aspect of the merger is undesirable. Thus the question of relief turns largely on the practicability and desirability of divesting only the tool joint and drill collar operations.

There are probably some advantages and economies that result from the manufacture and sale of tool joints and drill collars together with the manufacture and sale of American Iron's other products. In fact it definitely appears that the sale of tool joints and drill collars are facilitated when they are marketed with other oil well drilling equipment. However, the record reveals no reason to believe that the tool joint and drill collar operations can be or must be best utilized with the particular product lines previously engaged in by American Iron. The evidence is to the contrary. Numerous other companies engaged in the manufacture of oil well drilling equipment other than fluid-end expendable parts can obtain the same advantages and economies derived from the marketing of multiple products. The fact that the manufacture of these products need not be in conjunction with the manufacture and sale of fluid-end expendable parts is demonstrated by the fact that the only three firms of the top fifteen firms, which three firms hold 22.5% of the market, are engaged in

**2.** Partial divestiture has been ordered by both the courts and the Federal Trade Commission. Decisions of the Commission are especially illustrative of the use of the doctrine since the FTC is required to order divestiture whenever it finds a violation of section 7. See United States v. Continental Can Co., 1964 Trade Cas. Par. 71,264 (S.D.N.Y.1964); Union Carbide Corp., Trade Reg.Rep. (Transfer Binder, 1961–1963) Par. 15,503 (1961); Brillo Mfg. Co., F.T.C. Docket No. 6557, 3 CCH Trade Reg.Rep. Par. 16,543 (1963); Ekco Products Co., 3 CCH Trade Reg. Rep. Par. 16,956 (FTC Docket No. 8122 (1964)); Lone Star Cement Corp., Trade Reg.Rep. (Transfer Binder, 1953–55) Par. 17,183 (1965); United States v. Hilton Hotels Corp., 156 Trade Cas. Par. 68,523 (N.D.Ill.1956); Scoville Mfg. Co., 53 FTC 260 (1956); United States v. Meremount Automotive Products, 1960 CCH Trade Cas. Par. 69,881 (1960); United States v. Hertz Corp., 1960 CCH Trade Cas. Par. 69,762 (1960); Continental Baking Co., Trade Reg.Rep. (Transfer Binder, 1961–1963) Par. 15,886 (1962); Proctor & Gamble Co., 3 Trade Reg.Rep. Par. 17,858 (Consent Order February 9, 1957); United States v. Aluminum Ltd., 5 Trade Reg. Rep. Par. 71,895 (1956 Trade Case) Consent Decree Nov. 4, 1966).

the sale of fluid-end expendable parts and/or tool joints and drill collars. If the sale of the tool joint and drill collar facilities were for some reason limited to a firm not already in the old well drilling equipment industry the effectiveness of this relief would be highly questionable. However, there are a very substantial number of companies engaged in the oilwell drilling equipment industry that are potential purchasers and that can utilize their previously established businesses to profitably manufacture and sell tool joints and drill collars. These companies are presently incurring many costs that can be allocated or spread to tool joints and drill collars operations. Such a company will have an established reputation and expertise as a manufacturer and marketer in the oil field drilling equipment industry. Thus, the manufacture and sale of tool joints and drill collars by such a company will benefit from these attributes.

In addition, the evidence does not reveal that the operations of American Iron are so interrelated and noncompartmentalized that a divestiture of the tool joint and drill collar facilities would not be workable. The Special Master, who thoroughly studied American Iron's operations, found that the tool joint and drill collar operations were segregated from other American Iron operations and are susceptible to being separately divested. Moreover, subsequent to the trial of this cause, the plaintiff has agreed to a removal of both the tool joint and drill collar facilities to Houston, Texas. Plaintiff's concession to the removal of the tool joint and drill collar facilities is very significant. Earlier it had strenuously opposed this move, and much of the time the Government used in the trial of the case was devoted to showing that removal of these facilities was not required. Now it recognizes that "the necessities of the market" require this adjustment. While AMF has no Houston operations with which the tool joint and drill collar operations could be mixed, the Houston area is the pri-

mary business location for most of the many drilling equipment manufacturers that are prospective purchasers.

It is true that the sale of products other than tool joints and drill collars has accounted for about 42% of American Iron's total business, and the gross profit margin on the sales of products other than tool joints and drill collars has been considerably in excess of the profits margin on these items. This evidence does not show that another company already engaged in related lines of commerce will not find it desirable to manufacture and sell tool joints and drill collars. It has been suggested that it is necessary to include the most profitable lines in order to sell the less profitable lines. Such reasoning, however, ignores the fact that the attractiveness of the lines of commerce offered for sale will be determined largely by its price which in turn will depend largely on the anticipated profitability of the lines. Thus an order requring sale at their market price will, by definition, be a price that is attractive to the buyer. Adding lines with greater profitability will thus not increase the attractiveness of the purchase.

In addition to the fact that divestiture of the tool joint and drill collar operations acquired from American Iron will eliminate the undesirable features of the Reed-American Iron merger found by this Court, there are other reasons supporting the order of partial divestiture.

Requiring divestiture of only the tool joint and drill collar operations will leave intact Reed's ownership of the American-Iron fluid end expendable parts operations—the acquisition of which was not alleged to have been harmful. American Iron's 1965 sales of fluid end expendable parts amount to $1,313,000 and accounted for approximately 10% of this market. The fluid end expendable parts market is dominated by one concern that has sales approximately four times greater than any other competitor. As discussed earlier, American Iron had made several attempts to cut down on expenditures in an effort to improve its profitability.

Its research and development program was substantially limited and its efforts during the 1960's were described as being defensive only. Additionally, American Iron had reduced its sales force to 25 salesmen. The testimony of persons employed by other firms in the fluid end expendable parts market reveal that Reed is definitely considered a much more formidable competitor in this field than was American Iron. Reed has a sales force of over 125 persons engaged in the selling of oil well drilling equipment. Additionally, it is engaged in substantial research and development efforts.

While the Government did not contend that Reed's acquisition of the "noncompeting" lines of commerce might lessen competition, exclusively for purposes of rebuttal it made an attempt to show that competition in the fluid end expendable parts market would not be enhanced. A review of the evidence regarding the absence of pro-competitive effects in the fluid end expendable parts market reveals that, if anything, competition will be increased.

It was asserted that Reed's entry into the fluid end expendable industry "sets the stage for distributor favoritism." This contention is based on an argument that Reed, as a manufacturer of rock bits, would, because of certain "leverage" attributable to its rock bits, have substantial advantages in the marketing of fluid end expendable parts through supply houses. There was some testimony to the effect that a 7½% discount is given to supply houses on rock bits sales, for which the supply houses perform little or no function. Thus, this Court is asked to conclude that a manufacturer of both rock bits and fluid end expendable parts, will be able, because of an unearned discount on rock bits, to force supply houses to stock their fluid end expendable parts rather than those of other manufacturers that do not also manufacture rock bits. There are several reasons that independently eliminate the basis of this allegation. In the first place, the contention assumes that for many years without any reason, the rock bit manufacturers have, by giving a 7½% discount bestowed an unearned windfall upon the supply houses. It is difficult to believe that these companies have made any such gifts. Secondly, and independent of this assertion, is the fact that the testimony of the Government's witnesses revealed that the rock bit manufacturers did not determine which particular supply house received the discount on the rock bit. The drillers, to whom the rock bits are shipped directly from the manufacturer, designate the particular supply houses that will perform the credit and billing function and receive the discount. The manufacturer of the rock bit decides only the amount of the particular discount, not the distribution of the discounts among supply houses. Thus, the rock bit manufacturer would not be in a position to exercise favoritism by giving unearned discounts to certain supply houses and not to others. Third, the evidence reveals that the discount paid by the bit manufacturers is fully earned. The supply houses perform a credit and billing function. The supply houses generally are in a far better position to assume the credit function than are the rock bit manufacturers since they already have liens and mortgages upon the equipment of the various drillers. In this connection, it should be noted that the Government witness stated that in the case of certain of its own products, a ten percent discount is given for performing precisely the same functions for which bit manufacturers give 7½%. Finally, the evidence reveals that Reed had serious difficulties getting the supply houses to handle at least one of its products, a fact which rebuts the presence of leverage.

It was also alleged that the Reed-American Iron merger might set off a series of mergers between companies engaged in the rock bit and fluid end expendable parts markets. Aside from the fact that the evidence reveals no reason to believe that this would be harmful the testimony would seem highly speculative at best.

Two Government witnesses made references to a fear of trends of mergers, but on cross examination they admitted they knew of no other mergers in these markets.

It was asserted by the Government that "technological innovations may be resisted by the larger companies." There was testimony offered that this merger would increase the likelihood that there would be less research, development and innovation in the fluid end expendable parts market, apparently on the theory that larger firms do not engage in as much innovation. Aside from the merits of this theory, if anything, the Reed-American Iron merger has substituted a relatively small company, Reed, for a much larger company, AMF. Further, the fluid end expendable parts industry already has a number of companies far larger than Reed. For example, the United States Steel Corporation and the Armco Steel Corporation own major companies engaged in this market. Finally, the evidence clearly shows that Reed's research and development program is far larger and more active than was American Iron's.

It was also suggested that "large integrated producers, such as Reed, would have a financial advantage in the consignment marketing of oil equipment." This contention ignores two factors. As discussed above, Reed is far smaller than AMF and if the Government considers the risk to be one of a large company throwing money away in order to crowd out competitors, the risk becomes less likely as a result of the merger. On the other hand, if the allegation is based on the theory that Reed will sell fluid end expendable parts in the same manner that it sells rock bits, the evidence reveals that Reed considers this to be an economically unsound practice in which it has no intention of engaging.

Finally, the Government takes the position that the fluid end expendable parts market is not "oligopolistic" and for this reason the procompetitive effect in this market that Reed foresees will not occur. The Government's contention in this regard seems highly inconsistent with the position it has taken in other merger cases. While admittedly there are fourteen competitors in the business, three companies have 61% of the business, five have 79%, and eight companies have well over 90%.

A review of the testimony of the Government's two witnesses testifying as to the absence of a procompetitive effect on the fluid end expendable parts market reveals that they seem more afraid of increased competition in this market than a lessening of the competition. The primary witness in this regard admitted that Reed would be a much more formidable competitor than American Iron had been. Accordingly, this Court concludes that this merger will probably result in increased competition in the fluid end expendable parts industry.

■ This Court recognizes that procompetitive consequences in one market cannot be considered so as to outweigh the anticompetitive consequences in another market. United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). At the same time the fact that a merger has beneficial effects on competition in some markets is material to the type of relief to be decreed where permitting the acquiring company to keep the assets relating to the market where competition has been increased will at least be as effective in restoring competition in the other markets that have been adversly affected by the merger.

■ A divestiture of the tool joint and drill collar lines of commerce has another advantage in that the task involved will be only one-half of a divestiture of the entire business. By concentrating efforts on the sale and reestablishment of the offending lines of commerce Reed will be able to perform a more efficient and successful job. Additionally, since this is a situation where divestiture of part of the assets is at least as effective as a divestiture of all of the assets it is appropriate to take into consideration at least to some degree the hardship imposed on the defendants.

In this case there can be no doubt that divestiture of the offending lines of commerce will be easier for the parties.

Partial divestiture has a further advantage of decreasing the size of the purchase that must be made by another firm. Since less money will be involved it would seem reasonable to think that the number of potential buyers should be increased. Additionally, by permitting Reed to stay in the fluid end expendable parts market a number of fluid end expendable parts manufacturers, probably not qualified to acquire all of American Iron's operations, would become unobjectionable potential purchasers. While these parties do not have a relative advantage over others because of their position in the fluid end expendable parts market, they would be important potential buyers.

In reaching its conclusion on partial divestiture, this Court has carefully considered the Government's "preferred" remedy of rescission of the original agreement of acquisition and requiring Reed to return to AMF the American Iron operations. The Government contends that AMF is a proper defendant and argues that AMF is a law violator. It points out that the Government has frequently named sellers as defendants and notes that in several cases where suit has been brought prior to the consummation of a merger the courts have enjoined defendant sellers from completing the sale. United States v. Chrysler Corp., 232 F. Supp. 651 (D.N.J.1964); United States v. Ingersoll-Rand Co., 218 F.Supp. 530 (W.D.Pa.1963), aff'd 320 F.2d 509 (3d Cir. 1963); United States v. Parent's Magazine Enterprizes, Inc., 1962 Trade Cas., Par. 70,437 (N.D.Ill.1962). Alternatively, plaintiff asserts that, assuming arguendo, AMF is not a proper defendant to a section 7 charge, rescission would still be an appropriate remedy in accordance with the broad equitable powers of this court under section 15 of the Clayton Act. See United States v. Pabst Brewing Co., 183 F.Supp. 220 (E.D.Wis. 1960); In re Dean Foods Co., 3 Trade Reg.Rep. Par. 17,765 (FTC Complaints,

Orders, Stipulations, December 14, 1966.) It is urged that the rescission remedy fulfills and is consistent with the intent of Congress in that it would make clear to the business community that sellers of companies must respect section 7 and refrain from making sales, the result of which would substantially lessen competition.

In response the defendants emphasize that the language of section 7 does not make a sale unlawful and point out in the 52 years of section 7 enforcement no decision has sanctioned the relief now sought by plaintiff. Defendants argue that, assuming arguendo that utilization of such a remedy "accords with the intent of Congress to stem the tide of anticompetitive mergers", there is no congressional authority for this form of relief and that any number of unauthorized devices could be imagined that would discourage firms from making sales that would lessen competition. Defendants further point out that the Dean Foods Co. decision relied upon by the Government actually held that the seller was not a proper party to the section 7 charge and dismissed the complaint as to the seller with respect to that charge.

A choice between these positions is made unnecessary since this Court finds that practically none of the Government's arguments for rescission are particularly applicable to the present case and that the evidence reveals that rescission of the merger would be inconsistent with and unwarranted by the facts of this case. It is not the form of relief that will best restore competition in the tool joint and drill collar markets. Instead, divestiture of the tool joint and drill collar lines will best carry out the policies of section 7.

As noted earlier, American Iron had for sometime experienced very low profitability. Its performance had met none of AMF's profitability requirements. Testimony revealed that AMF is a highly leveraged company and one of its goals is that its subsidiaries and operating divisions achieve at least a 20% return before taxes on assets employed in the

conduct of the particular business. American Iron had experienced an earnings record of .5% in 1962, a loss return of 1.5% in 1963, a return of 4.3% in 1964, and a return of 3.1% for the first ten months of 1965. Rates of returns such as these would easily justify a liquidation of the assets and investment of the money elsewhere. AMF at one time attempted unsuccessfully to sell the American Iron operations and at another time considered moving American Iron from Oklahoma City to Houston, Texas, where the conditions are more favorable to a manufacturer and seller of drilling equipment. The latter proposal was, however, rejected on the ground that the cost was too great. Liquidation was also a seriously considered possibility since the company's salvage value was significant. On several earlier occasions AMF has liquidated its subsidiaries. In short, AMF has demonstrated that it is not suited for the running of the American Iron operation. AMF's ownership of other subsidiaries does not enhance its ability to be a parent of American Iron. One subsidiary, AMF, Tuboscope, Inc., has plants in Oklahoma City and Houston and is engaged in the protective coating of various types of tubular goods. It is true that drill pipe is frequently coated and that the availability of a coating plant would be helpful to the marketing of drill pipe. However, the coating of drill pipe amounts to only a very small percentage of the total coating business—the production phase of the oil and gas industry providing the largest market for coating. The evidence reveals that the existence of the Oklahoma Tuboscope plant would not appreciably help American Iron's operations. Even if it is assumed that the coating of drill pipe is essential to the marketing of drill pipe the availability of a coating plant does not give the tool joint manufacturer the needed drill pipe supply or the demand for its own products.

The testimony of AMF's executives convince this Court that the presence of AMF in the lines of commerce represented by the products of American Iron would be only temporary. The company has tried to succeed with American Iron, has failed, and is not interested in continuing its efforts. Moreover, the conditions now existing are even less satisfactory from AMF's standpoint than they were prior to the acquisition. Its employees and customers know that it is no longer interested in its oil well drilling equipment operations and are aware that a forced reentry would have no permanence. In light of these conditions it would be almost impossible to staff the American Iron's operations with the type of personnel that would be indispensable to the operations of a viable company. While it may be true that rescission would, notwithstanding these facts, result in setting an example that would discourage other concerns from making sales in violation of section 7, such a goal ignores the requirement that the relief to be ordered in the present case should be the most effective to restore competition. Rescission would not result in restoration of competition.

Restoration of the entire operation for return to AMF would be highly impracticable. The plaintiff has disregarded the tremendous task that would face the parties in reconstituting the American Iron operation. The difficulties of separating merged businesses are well known and have been a major factor in the development of the law of preliminary injunctions. Prior to the Government's investigation of the acquisition the Reed and American Iron operations were substantially integrated. American Iron's sales program was merged into and is now a part of Reed's sales effort. The sales force personnel and all but one of the top executives have resigned or have been transferred. Thus there is in no respect an independent entity operating from Oklahoma City, but rather only the production facilities and personnel.

Further, the impracticalities of rescission in the present case not only

impede effective relief but would obviously be imposing a serious hardship upon the parties. In the present case the merger was not consummated in the face of an antitrust complaint. The evidence reveals that while the parties were aware of possible antitrust problems and Reed agreed with AMF to assume all responsibility in the event a violation were determined, they did not feel that the merger was violative of the antitrust laws. While it is plain that the absence of an intent to violate the antitrust law does not prevent a merger from violating section 7, Brown Shoe Co. v. United States, 370 U.S. 294, 329 n. 48, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the awareness of the parties that the merger is likely to be attacked has been considered relevant to the possibility of involving the seller in the order of relief. Dean Foods Co., 3 Trade Reg.Rep. Par. 17,765 (FTC, Complaints, Orders, Stipulations, December 14, 1966); United States v. Pabst Brewing Co., 183 F.Supp. 220 (E.D.Wis. 1960). To require a rescission of this merger would be to impose a substantial burden on the parties involved, without accomplishing the primary goal of antitrust relief: restoration of competition. Under the Supreme Court's decision in *du Pont,* economic hardship can influence the choice only as among two or more effective remedies. In the present case, in light of the facts described above, rescission would not be an effective remedy. In reaching this conclusion, a primary consideration of this Court is the fact that partial divestiture will restore and maintain competition in all the markets involved.

The Court concludes that a decree should be entered requiring Reed to divest itself of the tool joint and drill collar lines acquired in the American Iron acquisition.

The foregoing opinion of the Court is adopted as findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P. Settle decree.